LaSALLE TALMAN BANK,
F.S.B., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–652C.

United States Court of Federal Claims.

Sept. 30, 1999.

Wilber H. Boies, Chicago, Illinois, with whom were Marie A. Halpin, Chicago, Illinois, and Thomas P. Steindler, Washington, D.C., for plaintiff. John H. McDermott and Suzanne Wallman, Chicago, Illinois, and Karla L. Palmer, Washington, D.C., also appeared on the briefs.

John A. Davidovich, Special Attorney, U.S. Department of Justice, Washington, D.C., with whom were Shalom Brilliant, Senior Trial Counsel, Rodger D. Citron, Alfonso G. Madrid, Patrick T. Murphy, William F. Ryan, and Tonya J. Williams, U.S. Department of Justice, Washington, D.C., for defendant. Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Deputy Director Jeanne E. Davidson, U.S. Department of Justice, Washington, D.C., also appeared on the briefs.

## OPINION

BRUGGINK, Judge.

This case is similar to more than 120 other cases filed as a result of the impact of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, on the savings and loan industry. It is one of a handful of lead cases picked for early trial on the issue of damages flowing from what the Supreme Court has characterized in *United States v. Winstar Corp.*, 518 U.S. 839, 870, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), as the breach of contract implicit in FIRREA. Following that decision, this court granted summary judgment for plaintiff on the issue of liability. *See California Federal v. United States*, 39 Fed.Cl. 753, 765–66, 779 (1997)

(*California Federal I*). The case was then transferred to this judge for resolution of plaintiff's damages. Trial was held over a four week period in February and March of this year; closing arguments were heard on May 27, 1999.[1] This is the third reported damages decision to date, following *Glendale Federal Bank v. United States*, 43 Fed.Cl. 390 (1999) and *California Federal Bank v. United States*, 43 Fed.Cl. 445 (1999) (*California Federal II*). It is hoped that the decisions in these early cases will facilitate either settlement or early resolution on appeal of common damage questions.

It is essential, however, to note characteristics of this case which may distinguish it from others yet to be decided. First, we deal here with a plaintiff that has undergone several evolutionary changes since it entered a contract with the government in 1982. Talman Home Federal Savings and Loan Association of Illinois ("Talman") entered into that contract as a mutual savings and loan association. In 1986, with the assistance of government payments, it converted to a stock association. Later, following the enactment of FIRREA, Talman was required to raise capital to replace supervisory goodwill. Consequently, it agreed in 1991 to be acquired by ABN AMRO North America, Inc. ("ABN AMRO"), subject to a capital infusion of $300 million by the acquirer. Following the merger, plaintiff operated as LaSalle Talman Bank ("LaSalle Talman"), a wholly-owned subsidiary of ABN AMRO, until it merged with LaSalle Cragin Bank ("LaSalle Cragin") in November 1995. Since that time, the bank has operated as LaSalle Bank ("LaSalle").

Second, Talman was a "Phoenix institution;" that is, it was taken under the wing, as it were, of FSLIC's Phoenix program. Under this program, Talman received a series of cash payments or promissory notes from FSLIC to keep it afloat and to enable it to convert to a stock association in 1986. In return, FSLIC replaced the majority of Talman's directors with independent directors it

---

1. Defendant filed two motions for summary judgment on the eve of trial, along with one motion in limine. Plaintiff filed three motions in limine. All these pending motions are denied as moot.

After trial, the court requested additional briefing and asked the parties to prepare additional exhibits. These are incorporated into the record as Court Exhibits 1–6.

appointed, subjected Talman to various operating restrictions, and required Talman to replace its Chief Executive Officer ("CEO").

Third, Talman was a well-run thrift. It was conservatively operated throughout. Its assets were predominantly invested in home mortgages. Problems the thrift faced in the early 1980s (before the contract at issue here) and after the passage of FIRREA were not the result of bad management or investment in high-risk assets.

Fourth, unlike some institutions, Talman survived. It was never taken over by regulators and hence neither the Federal Deposit Insurance Corporation ("FDIC") nor the Resolution Trust Corporation ("RTC") were a party to this litigation. Moreover, Talman not only survived, it prospered.

■■■ Bearing in mind the unique characteristics of this suit, a summary of the court's holdings are set out below.

A. In general, the court holds that:

(1) supervisory goodwill had real value;

(2) its removal had the potential to do real damage;

(3) if a savings and loan succeeded in replacing supervisory goodwill with other capital, the presumptive way to measure that damage is to give the savings and loan the reasonable costs it actually incurred in that replacement, reduced to the extent that real capital earns income that goodwill cannot, plus any incidental damages;

(4) the costs of replacement capital are not necessarily merely transaction or floatation costs;

(5) mitigation should be reasonable, and thus the cost of replacing supervisory goodwill should presumptively be limited to the least costly method available;

(6) if mitigation is not possible or is only partially successful, lost profits provide a valid alternative measure of damages;

(7) a savings and loan is entitled to show lost profits on the contract as a whole even though a non-breached portion of the contract was profitable;

(8) restitution is a remedy that fits poorly in the context of FIRREA claims, because FIRREA only caused a breach of part of the obligations assumed by the government in the agreements, and because restitution focuses on the difficult task of assessing benefits flowing from the non-breached portion of the contracts;

(9) the presumptive means of measuring the restitution remedy is the benefit conferred by plaintiff on the government, less the benefit conferred by the government on plaintiff; only if no benefit is conferred on the government is the calculation based upon the costs incurred by the bank.

B. In particular, the court holds that:

(1) LaSalle's theory of lost profits fails to the extent it relies on profits anticipated from a merger-conversion after the date of FIRREA;

(2) LaSalle cannot recover lost profits; it was more profitable after FIRREA than it would have been in the absence of FIRREA;

(3) LaSalle cannot recover under its hypothetical cost of replacement capital model because its actual experience in replacing capital provides a more appropriate measure of damages;

(4) LaSalle was able to effectuate a replacement of supervisory goodwill through a cash infusion of $300 million from ABN AMRO, but it did not prove that it incurred any costs by that partial replacement of capital;

(5) LaSalle is not entitled to any restitution because the benefits it received from the government under this contract outweigh the benefits it conferred on the government;

(6) LaSalle may recover incidental damages expended prior to the acquisition by ABN AMRO.

C. Further, the court *rejects* the following government defenses:

(1) LaSalle cannot recover either expectancy damages or restitution because it was approaching negative book value prior to entering the contract and like-

ly would have been liquidated absent the contract;

(2) LaSalle cannot recover damages merely because it benefitted from aspects of the agreements that the government did not breach;

(3) LaSalle cannot recover damages under any theory because it benefitted from the breach, as measured by the increase in its stock value in the two-week period straddling passage of FIRREA;

(4) LaSalle's damages should be capped by the market value of Talman at the time of FIRREA;

(5) LaSalle cannot recover lost profits because its earnings were greater after the breach than before.

## SUMMARY BACKGROUND

In the early 1980s, the persistence of high interest rates was playing havoc with the expectations of the savings and loan ("S & L") industry. In normal times, thrifts[2] are able to make a profit from the intermediation of money between depositors willing to accept relatively low returns on federally-insured deposits and borrowers willing to pay in excess of those rates. Because the loans held by S & Ls were primarily invested in long-term fixed-rate mortgages, whereas deposits were generally short-term and interest rate sensitive, the dramatic rise in interest rates in the 1970s and early 1980s caused the customary positive interest rate spread to invert. As a result, S & Ls lost their primary source of income. Even conservative, well-run thrifts were losing money.

Three "players" were being threatened by this phenomenon. Most immediately, thrifts were going under or were headed in that direction. Typical was the predecessor to plaintiff here, Talman, an established Chicago thrift and one of the two largest savings and loan associations in Illinois. The government does not question in this instance that either Talman or its successors were very well run. Talman's difficulties in the early eighties were not the result of mismanage-

ment. Like other thrifts, Talman was losing money because of the unusual negative disintermediation referred to above. It could not make up the persistent loss "in volume." In fact, the more money it borrowed at high rates the more it would lose. Thrifts were concerned about two phenomena. The first, of course, was the negative interest rate spread. The second was that losses were cutting into the thrifts' capital reserves which the banks were required to maintain above a designated percentage of assets in order to operate.

The other "players" were the two agencies with regulatory authority over the savings and loan industry: the Federal Home Loan Bank Board ("FHLBB"), the primary regulator of the industry, and the Federal Savings and Loan Insurance Corporation ("FSLIC"), the agency embodying the federal promise to depositors that the United States stood behind deposits. By year end 1981, the deposit liabilities of all S & Ls exceeded the market value of their assets by $150 billion. FSLIC faced the potential of having to pay out billions of dollars in deposit guarantees to depositors if thrifts failed. At that time, however, the FSLIC insurance fund had assets valued at less than $4 billion available. Each thrift that went under, in other words, was a serious problem for the agency.

FHLBB, however, had some aces in the hole. In its regulatory capacity, it could: lower minimum capital ratios; forbear from enforcing those ratios; permit mergers and acquisitions between healthy S & Ls and those experiencing capital shortfalls; facilitate supervisory mergers between healthy S & Ls and struggling thrifts; and as a last resort, it could take over and liquidate thrifts which had exhausted their net worths. The agency aggressively began to use these and other tactics in an industry-wide effort to buy time, to keep the industry afloat in the hope that interest rates would fall and reverse the hemorrhage of money.

2. The terms "savings and loan," "S & L," and "thrift," are used interchangeably in this opin-

ion.

FHLBB reduced the minimum capital requirement from five percent of net worth to four percent of liabilities in November 1980, see 45 Fed.Reg. 76,111 (1980), and then lowered this requirement to three percent of liabilities in January 1982, see 47 Fed.Reg. 3543 (1982), the minimum level authorized by Congress. See 12 U.S.C. § 1726(b) (Supp. V 1981). As capital reserves of S & Ls fell below this minimum capital requirement, the agency resorted to forbearance and ultimately, as S & Ls exhausted their capital reserves, supervisory mergers as the solution to the crisis. The agency undertook a form of commercial triage, identifying those thrifts most likely to survive, encouraging them to take over thrifts in worse condition, and then supporting the merged institutions.

Supervisory mergers proved to be an especially effective means of dealing with the problems of failing thrifts without incurring the prohibitive expense of liquidation. In these arrangements, the two regulatory agencies arranged mergers and acquisitions of failing S & Ls by offering healthy institutions a variety of inducements to assumee the net liabilities of the weakest thrifts. See Winstar, 518 U.S. at 847–48, 116 S.Ct. 2432. These included financial assistance (in the form of cash payments and/or promissory notes), continued forbearance, and, most importantly, favorable accounting treatment.

In the latter category, FHLBB permitted acquiring thrifts to utilize the purchase method of accounting. Under this method, an acquiring thrift was able to recognize the net assumed liabilities of the failing thrift it had taken over as an intangible asset—supervisory goodwill—that the agency recognized as regulatory capital which counted toward the three percent capital requirement. See id. at 848–50, 116 S.Ct. 2432. Supervisory goodwill provided another benefit to acquiring thrifts: Because FHLBB permitted the thrifts to amortize supervisory goodwill over extended periods of time—up to forty years—thrifts were able to absorb the net assumed liabilities by incurring annual amortization expenses for this same extended period; on the other hand, acquiring thrifts were able to recognize accretion income, a related accounting adjustment triggered by purchase accounting, over a substantially shorter period. See id. at 851–52, 116 S.Ct. 2432. The result was that acquiring thrifts generated a net paper profit for approximately seven years following the acquisitions. See id. at 852–53, 116 S.Ct. 2432.

A handful of markets were so depressed, however, that regulators were unable to arrange supervisory mergers even by offering this panoply of inducements. FHLBB devised the Phoenix program as an attempt to resolve troubled institutions in these areas. It represented the last possible solution considered by the agency short of liquidating an insolvent institution. See FHLBB, Solutions for Supervisory Cases in Order of Preference at 4 (Pl.'s Ex. 402) (identifying the Phoenix option as the eighth most desirable option for resolving failing thrifts; the only less desirable option was liquidation). The concept of the Phoenix program was the merger of a number of failing institutions into one association that would receive significant financial support, continued forbearance, and the benefits of purchase accounting, including recognition of supervisory goodwill as regulatory capital. In return, FHLBB required the surviving Phoenix institution to agree to: allow the agency to review and approve operating plans; replace a majority of the board of directors; review and approve key officers and directors of the association; and merge the association should a viable, fiscally sound merger candidate or acquirer express interest. If the merger of such struggling institutions into one association produced the efficiencies hoped for in consolidation, then the Phoenix would metamorphose over time into a healthy institution. In the short run these mergers eliminated the immediate need to liquidate many thrifts. As an added benefit, the regulators had one bank instead of several to cope with.

In the early 1980s, Illinois was one of these distressed markets and the location of two Phoenix institutions, one of which was founded upon Talman. Talman was a large, conservatively run, well-managed institution of long standing in the Chicago market. By year-end 1981 it had grown from a one-branch thrift into an institution operating twenty-nine branches and holding $3.7 billion

in assets. This growth had been achieved in large part by a series of mergers and acquisitions. In 1980, Talman had merged with Home Federal Savings and Loan Association ("Home Federal"), a thrift with $860 million of assets; in 1981, it had acquired a smaller thrift, Melrose Savings.

Despite this recent growth in assets, Talman was in some financial difficulty in the early 1980s. In 1980, Talman suffered a loss of $6 million, its first loss since its founding in 1922. In 1981, as interest rates continued to rise, Talman's losses intensified. It suffered a loss of $55.7 million that year, and by the end of that year its net worth had dwindled to less than $75 million. It lost a further $9.1 million in January 1982, and by the following month Talman was forecasting it would lose another $64.6 million before the end of that year. By its own projections, therefore, Talman would dissipate its net worth by January 1983. FSLIC's projections were even more dire, showing Talman would exhaust its net worth by August 1982.

*The 1982 Supervisory Mergers*

There were, however, many thrifts in the Chicago area in even worse condition. In February 1982, FSLIC predicted that sixty-four Illinois thrifts would exhaust their book net worths by the end of the year. On a mark-to-market basis, their condition was even worse.[3] Moreover, this number included five of the six largest associations in the state, one of which was Talman. One thrift in particular trouble was Unity Savings Association ("Unity"). In the fall of 1981, it became apparent that Unity would shortly exhaust its net worth. FSLIC engaged in considerable effort to seek an acquirer, both in Illinois and out of state, but to no avail. By February 1982, Unity had exhausted its net worth. As a result, it was placed into receivership by the Illinois thrift regulatory agency, with FSLIC as the receiver.

Later that month, FSLIC approached Talman and suggested that it enter the Phoenix program and become the surviving entity of a Phoenix comprising Unity and two other struggling Chicago thrifts. Faced with the prospect of an uncertain future once its net worth expired, as Talman itself predicted would happen in early 1982, Talman agreed to the combinations. On February 19, 1982 the FHLBB approved the merger of Talman with North West Federal Savings and Loan Association of Chicago ("North West") and Alliance Savings and Loan Association ("Alliance"). Talman was the surviving institution after these mergers. FSLIC agreed to permit Talman to count the liabilities of Northwest and Alliance as an asset in the form of supervisory goodwill, and to apply this supervisory goodwill towards the regulatory capital requirements that Talman had to satisfy in order to continue operating.

At the same time, the FHLBB also approved the acquisition by Talman of all the assets and liabilities of Unity. The structure of the Unity transaction differed slightly from the mergers with North West and Alliance, in that Unity was first placed into receivership under FSLIC, and then the assets and liabilities of the receivership were transferred to Talman. At the time of the acquisition, FSLIC also agreed to permit Talman to count Unity's outstanding net liabilities as supervisory goodwill.

As a result of these three separate agreements, Talman assumed the net liabilities of each thrift—determined by a mark-to-market of the assets and liabilities of each thrift—and FSLIC agreed to permit Talman to count $912 million, the amount of these net liabilities, as an asset in the form of supervisory goodwill. Further, Talman was permitted to amortize this supervisory goodwill over forty years.

*August 27, 1982 Supervisory Merger*

To support this supervisory merger, FSLIC contributed $10 million in cash to Talman (the resulting thrift following the supervisory mergers discussed above) and in return received income capital certificates

3. A mark-to-market valuation evaluates the net worth of a company under the prevailing market conditions; assets are valued according to market price rather than at book value. Because interest rates had risen dramatically in the late 1970s and early 1980s, the market value of fixed-rate securities—assets extensively held by thrifts—had fallen precipitously. Consequently, by 1982, the book net worths of thrifts substantially overstated their actual net worths, i.e., the value of each thrift if the assets and liabilities were liquidated.

("ICCs") issued by Talman—interest-bearing notes that FSLIC was entitled to redeem at an unspecified future date. The cash payment improved Talman's capital position. In addition, and of significantly greater importance to FSLIC, the agreement providing for the purchase of these ICCs triggered a variety of mechanisms by which the agency gained substantial control of Talman's operations. As a result of those agreements, Talman was forced to replace a majority of its board of directors with independent directors chosen by FSLIC.

In August 1982, as part of its continuing status as a Phoenix association, Talman entered into yet another merger, this time with the First Federal Savings and Loan Association of Peoria ("Peoria"). Talman again received a credit equal to Peoria's net liabilities in the form of supervisory goodwill. This elevated the value of Talman's supervisory goodwill from the four 1982 acquisitions to a net total of $912,614,000. At about this same time, FSLIC infused an additional $60 million in cash into the Talman Phoenix in return for an equal amount of ICCs.

Following the four supervisory mergers, Talman worked through the problem loans acquired from the other thrifts. In the subsequent three years, Talman sold off ninety percent of the assets acquired from the four merged thrifts. Because interest rates had fallen considerably since 1982, Talman realized $254.6 million in gains from these sales. These sales also generated net operating loss carry-forwards ("NOLs"), tax credits that Talman could utilize to offset gains in future years.

At the end of 1984, at the urging of FSLIC, Talman's board replaced the existing CEO with Theodore Roberts, then-president and CEO of the Federal Reserve Bank in St. Louis and someone highly regarded both in Washington and in the banking industry.

The conjunction of declining interest rates, merger efficiencies, good management, $585.6 million in cash infusions and debt forgiveness from FSLIC, and the unique advantages of supervisory goodwill combined over the next seven years to completely alter the prospects of Talman. By 1986, Talman had returned to profitability, even after amortiz-

ing $20.3 million in supervisory goodwill each year. At the end of 1989, Talman's supervisory goodwill stood at $514.0 million. This represented a decline from the original amount of $912.6 million. This phenomenon was accelerated by a markdown in 1986 when FSLIC infused $165.0 million of cash into Talman and canceled $71.6 million in ICCs.

In that year, an agreement between Talman and FSLIC provided for the conversion of Talman from a mutual association to a stockholder owned association. FSLIC retained its own investment banker and its own counsel to advise it regarding Talman's conversion. FSLIC's banker and counsel proposed amendments to Talman's offering circulars, and these were incorporated by Talman before the circulars were released. The circulars included discussion of Talman's use of supervisory goodwill as a means of satisfying regulatory capital requirements. Talman proceeded with its stock offering in December 1986, raising gross proceeds of $80.8 million and realizing net proceeds of $71.8 million in capital. In place of a forty year depreciation schedule for amortization of goodwill, the schedule was reduced to thirty years and the payment increased to $23.1 million.

*Merger–Conversion Discussions*

Following Talman's stock conversion, Roberts actively sought out Chicago area mutual thrifts that would be suitable partners for acquisition or merger-conversion with Talman. In a merger-conversion, Talman would acquire a mutual savings and loan association (i.e., a thrift owned by its depositors), and, at the same time, the mutual association's depositors would acquire stock in Talman equivalent in value to the appraised value of the acquired association. By this means, the two thrifts would merge their operations, the acquired thrift's depositors would purchase stock in the resulting thrift, and the combined thrift would raise capital equivalent to the appraised value of the mutual association, all in one transaction. The benefits to Talman of a merger-conversion were numerous: (1) Talman would raise capital from the issuance of stock; (2) Talman would further increase its equity position by assuming the net worth of the acquired thrift; (3) Talman

would increase its branch network and asset base; and (4) the combined thrift would be able to achieve cost savings from the elimination of duplicated administrative costs and the closure of redundant branches. The first two of these benefits were of key importance to Talman because they would enable it to raise much-needed capital. The second benefit, in particular, provided an opportunity to increase Talman's net worth at low cost because, as Roberts testified, valuations of thrifts at that time were running at approximately 40% of book value. These benefits by far exceeded the downside, the cost of issuing common stock.[4] Roberts testified that merger-conversions were viewed in the industry as a "free lunch" for the acquiring institution, because it was able by this device to reap the benefits of the discounted valuation of the acquired thrift.

Roberts' efforts yielded one successful acquisition prior to FIRREA. In December 1988, Talman acquired Great Northern Savings Bank ("Great Northern"), a four-branch thrift located in the northern suburbs of Chicago. His efforts to negotiate a merger-conversion, however, did not bear fruit. The record reveals at least four such unsuccessful attempts. In 1987, Roberts held discussions with the CEO of Hinsdale Federal Savings and Loan Association ("Hinsdale"), but the discussions ended after Hinsdale's CEO was dismissed. In 1988, Roberts held discussions with the CEOs of Amity Federal Savings and Loan Association ("Amity") and Deerfield Federal Savings and Loan Association, but these also faltered. In none of these cases

did negotiations advance beyond the level of general preliminary discussions.

The fourth merger-conversion target, and by far the largest, was Cragin Federal Bank for Savings ("Cragin"), which held over $2 billion in assets and operated twenty-six branches, primarily in Chicago and its northwestern suburbs. In early 1988, Roberts contacted Adam Jahns, Cragin's President, and suggested the possibility of a merger-conversion between the two thrifts. After this initial contact, the two men met on three or four more occasions during 1988 and 1989 to further discuss the prospect of a merger-conversion.[5]

During these meetings they reached agreement that a merger-conversion would be beneficial to both companies for three reasons: (1) the branch locations of the two thrifts provided a good "fit" because Cragin's branches were distributed predominantly on the northwest side of Chicago, the area of Chicago where Talman was least well represented; (2) the transaction would yield significant administrative cost savings (expected to be approximately 20%) because of overlap between administrative services each already provided; and (3) the corporate management styles and asset portfolios were compatible—both thrifts derived the bulk of their earnings from mortgages or mortgage-backed securities tied to single-family residences, and both eschewed high-risk investments.

The imminent prospect of FIRREA brought these discussions to a close. Shortly before enactment of the statute, after it had become clear that supervisory goodwill would

---

4. One "cost" experienced by Talman's shareholders (but not the thrift) would be the dilution of earnings due to the issuance of new stock. After a merger-conversion, Talman's (presumably) increased earnings would be shared by a larger base of shareholders.

5. There were no witnesses to any of these meetings, nor did the two men keep any written record of their discussions. Both Roberts and Jahns testified that they took measures to prevent even their staff from learning of their talks. For example, Roberts used the code name "Uncle Joe" when he called Jahns at his office. Their meetings were held on days when the two men were scheduled to attend the same Chicago trade meetings or conferences. The two men would meet at a nearby hotel. Nor were the boards of directors of each bank aware of this ongoing

series of meetings, though Talman's board was aware, in a general sense, that Roberts was discussing the possibility of a merger-conversion with several Chicago thrifts.

Despite this lack of documentary support, the court finds that this series of meetings did occur, and the purpose of the meetings was as described, namely, a possible merger-conversion. The court heard three days of testimony from Roberts and, as noted in the text of this opinion, found him to be a highly credible and trustworthy witness. His testimony was supported in all material regards by Jahns' testimony. We note, however, that the absence of any reference in the minutes of Talman's board meetings indicates that the discussions were at a very early stage. See text infra § III.C.2.a.

be excluded from regulatory capital, Jahns informed Roberts that Cragin was no longer interested in continuing merger-conversion negotiations. Despite this rebuff, Roberts continued to pursue the possibility of a Talman–Cragin merger-conversion. In mid-August 1989, shortly after passage of FIRREA, he discussed this possibility with Stuart Brafman, the supervisory agent at OTS assigned to Talman, and even submitted a letter to Brafman outlining the benefits of such a merger on Talman's capital position. *See* Pl.'s Ex. 150 (Aug. 21, 1989).[6] When Roberts again contacted Jahns, however, he confirmed that Cragin was no longer interested in a merger with Talman.

*Enactment of FIRREA*

On August 9, 1989, FIRREA was signed into law. Section 301(t) of FIRREA addressed capital standards. This section, codified at 12 U.S.C. § 1464(t) (1994), introduced a tripartite capital requirement. Every thrift would be required to comply with tangible capital, core capital, and risk-based capital requirements. Under the tangible capital requirement, thrifts were required to maintain tangible capital equal to at least 1.5% of assets. By definition, supervisory goodwill, an intangible asset, could not be counted toward this requirement. The statute permitted a small portion of a thrift's supervisory goodwill to be counted toward the core capital ratio, but this "qualifying supervisory goodwill" was phased-out entirely by year end 1994. The core capital ratio, which was described as a "leverage limit," required thrifts to maintain core capital of at least three percent of their assets. OTS was directed to implement these regulations by adopting capital ratios no less stringent than set out in the statute. In November 1989, OTS issued regulations that adopted these capital ratios precisely. FIRREA also eliminated FSLIC and FHLBB and replaced them with a new regulatory agency, OTS; established a new thrift deposit insurance fund under the auspices of the Federal Deposit Insurance Corporation ("FDIC"); and created the Resolution Trust Corporation ("RTC") to liquidate or dispose of closed thrifts.

The effect of FIRREA in August 1989, along with OTS's implementing regulations in November 1989 and particular directions by OTS to Talman, was to completely alter the landscape. Together, they meant that, although Talman continued to hold supervisory goodwill, only approximately $80 million counted as "qualifying supervisory goodwill" and thus could be counted toward FIRREA's core capital requirement. Moreover, this qualifying supervisory goodwill was to be phased out completely by December 31, 1994, almost eighteen years ahead of the schedule in the agreements. More importantly, *none* of Talman's supervisory goodwill could count toward the 1.5% tangible capital requirement, which took effect on December 7, 1989. Without supervisory goodwill, Talman had *negative* tangible capital of $207 million. As of December 7, 1989, therefore, Talman was out of compliance with FIRREA's capital requirements and was faced with the imminent possibility of closure.

*Talman's Operation Under Approved Capital Plans*

Immediately after OTS' regulations took effect on December 7, 1989, Talman was no longer in compliance with the new regulatory capital requirements and thus susceptible to be put into the receivership of the RTC. It was allowed to survive initially through regulatory forbearance. Talman was also immediately subject to a number of operating restrictions and was required to submit a capital plan to OTS for approval. This plan had to show how Talman proposed to regain capital compliance. Talman submitted its first proposed capital plan to OTS on December 18, 1989. After several months of negotiations, OTS conditionally approved the plan on March 16, 1990. OTS imposed numerous conditions, but two were critical: Talman

6. This document presents circumstantial evidence to support plaintiff's argument that Talman was discussing a merger-conversion with Cragin. The letter uses Cragin's financial data to project that the resulting institution would attain capital compliance by 1995, indicating that Roberts had considered the potential merger in some detail. The letter also requests confirmation that such a merger would not be contrary to OTS policy "[b]efore proceeding with *final* negotiations." *See* Pl.'s Ex. 150 at 2 (emphasis added).

was prohibited from making dividend payments; and Talman's deadline for achieving capital compliance was brought forward to December 31, 1993 (one year earlier than the deadline established in FIRREA). As required under the terms of this plan, Talman continued its efforts to raise additional capital. In fact, Talman intensified its efforts.

Thrifts rendered noncompliant with minimum capitalization requirements after FIRREA had only two possible means of re-attaining compliance (and, thus, of keeping their doors open): raising new capital or shrinking assets and liabilities. Talman did both. Shrinkage alone could not have brought Talman into capital compliance, however, because, at the time of the breach, it had negative tangible capital. OTS regulations required Talman to comply with a 1.5% tangible capital ratio. Talman, therefore, was forced to raise capital by OTS. This replacement operation was accelerated by OTS' decision in June 1991 to require compliance with FIRREA's phased-in capital requirements by the end of that year.

Roberts first undertook extensive efforts to raise capital to replace the supervisory goodwill through a variety of means. In December 1989, Talman retained Salomon Brothers, Inc. ("Salomon") to serve as its investment banker and investigate possible methods by which Talman could raise capital, either by merging with a financial institution that could provide Talman with a cash infusion, or by raising capital by an issuance of common or preferred stock. Salomon's efforts to raise capital by issuing stock proved unrewarding—Salomon and several other investment banks informed Roberts that an issuance of stock was infeasible while Talman was operating subject to OTS-approved capital plans. Moreover, the dividend rate of 25–30% demanded by "vulture investors" on preferred stock made a stock issuance unrealistic. Considering the amount of capital Talman needed to raise and the high dividend rates, the required annual dividend payments would have exceeded the thrift's income. Salomon's efforts to find an institution willing to merge with Talman were also unsuccessful at first.

Roberts' and Salomon's efforts were eventually successful. By early 1991, Talman was engaged in discussions with ABN AMRO, a large multinational bank based in the Netherlands, and Bank of America Corporation ("Bank of America"). By June of that year, ABN AMRO had verbally offered to buy all of Talman's shares at a price of $2.50 per share and to infuse capital necessary to bring Talman into capital compliance. On June 24, 1991, OTS convened a meeting with Talman's board of directors. At that meeting, Timothy Ryan, the OTS Director, informed the board that Talman was required to regain capital compliance before the end of that year, two years ahead of the December 31, 1993 schedule required by Talman's capital plan.

Negotiations with the two potential acquirers continued after the June 24, 1991 meeting. Bank of America submitted a bid of more than $5 per share. Roberts' aggressive efforts on behalf of the bank and its shareholders resulted in a bidding war, with the winning bid being submitted by ABN AMRO, which offered to purchase Talman's 9.7 million outstanding shares for $10 per share and to infuse sufficient capital to meet the OTS core capital requirement. Faced with the prospect of closure if the bank did not meet the new December 1991 deadline for reaching capital compliance, Talman's board voted to accept ABN AMRO's offer on July 15, 1991. At that time, the $10 acquisition price represented an 82% premium over the market price of $5.50 per share.

The July 15, 1991, merger agreement with ABN AMRO incorporated the terms of ABN AMRO's offer and several covenants binding on Talman, including an agreement to dispose of certain assets prior to completion of the merger. In particular, Talman agreed to sell certain mortgage-backed securities in its portfolio that were carrying unrealized capital gains, and to use its best efforts to sell the Peoria branch offices. Prior to this date, and in preparation for the acquisition, Talman had already shrunk its assets by approximately $1 billion. Roberts testified that ABN AMRO also required Talman to dissolve its finance subsidiaries because, without the advantage of tax carry-forwards held by

Talman, this form of borrowing would not be a low cost source of funds to the post-acquisition bank, LaSalle Talman.

All of these measures were taken in response to FIRREA and in an effort to bring Talman into compliance with FIRREA's new capital requirements. In addition, and perhaps most critically, as a condition of this acquisition, ABN AMRO infused Talman with $300 million in cash on February 28, 1992, the date the acquisition was completed.

In accordance with the merger agreement, by the end of 1991, Talman had sold almost $700 million of mortgage-backed securities; dissolved seven of its eight finance subsidiaries by redeeming $555 million of preferred stock;[7] and entered into a definitive agreement to sell the eight Peoria branch offices and associated deposits.[8] The sum effect of these transactions, once completed, was to reduce Talman's assets (and liabilities) by approximately $1 billion: in September 1991, Talman held assets of $5.83 billion; by March 1992, it held assets of only $4.92 billion.

Following approval by OTS, ABN AMRO's acquisition of Talman was completed on February 28, 1992. As a result, Talman ceased to exist and was replaced by LaSalle Talman. As part of the merger, and as required by OTS, ABN AMRO infused $300 million of capital, which was an amount sufficient to raise Talman's core capital ratio to four percent (based on Talman's equity and assets immediately prior to the merger).[9] Because the acquisition employed purchase accounting, Talman's assets and liabilities were marked-to-market. This had two immediate effects: it eliminated Talman's supervisory goodwill; and, because the market value of Talman's assets exceeded their book value, boosted its core capital ratio to 6.65%. From the moment of existence, therefore, LaSalle Talman was in compliance with all three capital requirements. LaSalle Talman and its successor, LaSalle, have therefore remained in full compliance with each of OTS' capital requirements at all times.

Buoyed by ABN AMRO's $300 million capital infusion in 1992, and approximately $800 million in subsequent cash expenditures by its parent company, LaSalle Talman pursued a strategy of acquiring other Chicago area thrifts. On November 10, 1994, LaSalle Talman purchased twenty-six branch offices and the assets and liabilities of Home Savings of America ("Home Savings"), swelling LaSalle Talman's assets by approximately $600 million. LaSalle Talman received a capital contribution of $134 million from ABN AMRO to finance the acquisition.

7. The remaining finance subsidiary was funded by fixed-rate preferred stock that could not be redeemed prior to May 31, 1992. The preferred stock of that subsidiary was redeemed and the subsidiary dissolved in 1992.

8. The sale was completed in March 1992, shortly after completion of the merger with ABN AMRO.

9. The merger agreement required ABN AMRO to infuse sufficient capital to meet the core capital requirement in effect on the date of merger, or a 4% core capital requirement if required by OTS. The minimum core capital ratio in effect on February 28, 1992 was 3%, see 12 C.F.R. § 567.8 (1992), although OTS had proposed raising this ratio to at least 4% for all but the most well-capitalized thrifts. See 56 Fed.Reg. 16,283, 16,-283 (proposed Apr. 22, 1991). Roberts testified that OTS nonetheless required ABN AMRO to meet a 4% core capital level as a specific condition of the acquisition. The government has not challenged that statement and we accept it as accurate.

Requiring ABN AMRO to bring Talman up to a 4% leverage ratio was consistent with capital standards employed by other banking regulatory agencies at that time. The Office of Comptroller of the Currency had promulgated a standard that required all but the most highly-capitalized national banks to maintain a leverage ratio of 4–5%. See 55 Fed.Reg. 38,797, 38,798 (Sept. 21, 1990). In March 1991, the FDIC had implemented an identical minimum leverage ratio range for all but the most well-capitalized state-chartered banks. See 56 Fed.Reg. 10,154, 10,-162 (Mar. 11, 1991). Moreover, the FDIC, which has authority to take enforcement actions against any insured depository institution (including thrifts) with unsafe or unsound capital conditions, see id. at 10,157, had announced that it would consider taking enforcement action against thrifts that failed to meet its minimum leverage ratio requirements and OTS' capital requirements. See id. at 10,157–58. A requirement by OTS that ABN AMRO recapitalize Talman to a 4% core capital ratio as a condition of the merger would have been consistent with OTS' proposed rule and the regulations of other banking agencies.

A second merger was completed in November 1995, when LaSalle Talman merged with Cragin's successor, LaSalle Cragin. The merger, which was accomplished as a pooling of assets, resulted in the creation of LaSalle Bank, plaintiff's present incarnation. Although this merger did not involve any cash payment by LaSalle Talman, ABN AMRO had expended $488.9 million in cash to acquire all of Cragin's outstanding stock in June 1994. The resulting institution, LaSalle Cragin, another wholly-owned subsidiary of ABN AMRO, was merged into LaSalle Talman in November 1995. As a result of this merger, LaSalle's assets increased by almost $3.5 billion to more than $10.6 billion by year-end 1995.

In the fourth quarter of 1997, LaSalle acquired Bell Savings using $167.5 million in cash funneled to it by ABN AMRO. This acquisition increased LaSalle's assets to more than $11.5 billion.

## DISCUSSION

### I. Plaintiff's Damages Theories

Plaintiff's complaint seeks an award of damages under three alternative theories: lost profits; cost of replacement capital; and restitution. The first two theories seek expectancy damages—plaintiff's attempt to capture the benefit of its bargain with the government.

Under its lost profits claim, plaintiff seeks to recover profits foregone due to the government's breach between 1989 and the present. Plaintiff claims $858.8 million in damages. The majority of this amount consists of earnings that allegedly would have accrued from Cragin's operations following a hypothetical merger-conversion with Cragin in 1989, which, plaintiff asserts, would have occurred absent the breach. For reasons that will be explained later, the lost profits calculus also includes earnings attributable to Home Savings after it was merged with LaSalle Talman in 1994. In addition, plaintiff alleges that, if it had been permitted to count supervisory goodwill towards regulatory capital after FIRREA, it would have been able to maintain a larger asset base and thus generate higher earnings due to the positive interest rate spread. Its theory also encompasses several other elements, including wounded bank damages, which will be discussed in some detail *infra*.

Plaintiff's second damages theory is based upon the cost of replacement capital. Under this approach, it seeks to recover the costs it would have incurred if it had issued preferred stock in 1989 to replace $431.1 million of supervisory goodwill then on its books. In essence, plaintiff's calculus sums hypothetical annual dividend payments to preferred stockholders, after adjustments to recognize the impact of corporate income taxes and the income-generating benefit of cash. Plaintiff seeks $1,196.6 million in damages under this approach.

The third damages theory, restitution, provides an alternative formulation of damages which attempts to "unscramble the egg" and return the parties to the position they would have been in absent the contract. Plaintiff claims that it is entitled to reimbursement for the $912.6 million in net liabilities it assumed from the supervised mergers with the four failing thrifts. Off-setting this alleged cost are two benefits: FSLIC payments and forgiveness of debts totaling $585.7 million; and Talman's total income (before taxes and amortization of goodwill) from the commencement of the contract until the breach. The net result is a restitution claim for $295.1 million.

### II. Defendant's Threshold Defenses

Defendant raises a variety of arguments to counter plaintiff's recovery under either of its measures of damages or its restitution claim. The government also raises several more comprehensive arguments that, if accepted by the court, would preclude any award of damages to plaintiff. Because these arguments relate to fundamental disagreements at the heart of this case, we will address these before discussing the details of each of plaintiff's damages measures and defendant's particularized defenses.

*The Value of Supervisory Goodwill*

The parties and the court have struggled with classifying supervisory goodwill in some meaningful way. Unfortunately, supervisory

goodwill has no direct analog in the market place. The government's view is that supervisory goodwill is so totally incorporeal and artificial a construct that is basically worthless—it is merely an accounting fiction. Any talk about recovering damages for taking it away is therefore silly. In part this view was accepted by Judge Hodges in *California Federal II. See* 43 Fed.Cl. at 449, 459–60. This court disagrees, respectfully.

Thrifts were required to meet minimum capital requirements in order to remain in business. Moreover, thrifts which participated in the government's Phoenix program, such as Talman, were not in compliance with these capital requirements and in danger of exhausting their net worth. The creation of supervisory goodwill through purchase accounting and the treatment of supervisory goodwill as regulatory capital enabled the acquiring institutions to merge with other poorly-capitalized thrifts without immediately reflecting the full brunt of their financial plight on the resulting Phoenix's books. The agreements enabled the thrifts to keep their doors open and—equally importantly—gave them additional opportunity to generate operating profits to the extent they could leverage net positive capital resulting from the addition of supervisory goodwill to their books.

Defendant has repeatedly argued throughout this case that supervisory goodwill was merely an "accounting gimmick." *See, e.g.,* Def.'s Post–Trial Br. at 31–32 (quoting *California Federal II,* 43 Fed.Cl. at 459 and *Winstar,* 518 U.S. at 900, 116 S.Ct. 2432). This is, of course, true. Nevertheless, it was recognized as regulatory capital by the regulators, and as such, had substantial value to plaintiff. It permitted Talman to continue to operate once it had acquired the four S & Ls and precluded the need for Talman to be placed into receivership and, possibly, liquidated. It also was sufficient to raise Talman's net worth ratio to one percent, the level deemed by FHLBB to be acceptable for the bank. Talman was thus able to maintain its enlarged portfolio of assets—over $6 billion—which resulted from the Phoenix mergers and acquisition.[10] Once interest rates fell to the level that enabled Talman to regain a positive interest rate spread, which occurred by 1986, the bank was able to generate net income on this enlarged asset base. Thereafter, Talman was able to generate significant net income, in large part because supervisory goodwill enabled it to maintain the required one-percent net worth ratio with an asset base of approximately $6 billion.

The success of the 1986 public offering supports the notion that investors regarded supervisory goodwill as a valuable asset. Even after the $100 million FSLIC payment, Talman held almost $600 million of supervisory goodwill at the end of 1986. Because the bank had more than $300 million in *negative* tangible capital, the existence of this substantial quantity of supervisory goodwill was the only reason Talman had positive regulatory capital. Nevertheless, investors were willing to invest in Talman, precisely because supervisory goodwill had value as regulatory capital.

When the court asked government counsel during closing argument, "what is the closest analog" to supervisory goodwill, he answered, "cash." Tr. at 2556. The court agrees in part. In some respects, supervisory goodwill is like cash. Like cash, it could serve as capital. In the period 1982–1986, for example, FSLIC traded $225.4 million in supervisory goodwill for an identical amount of cash. And yet it is different in other ways. Cash would always be preferable to supervisory goodwill because it has the ability to generate interest income. A second reason is that cash is protean; it can be exchanged readily for other forms of property or capital. Supervisory goodwill, on the other hand, was like S & H Green stamps, only recognized at the company store.[11] A third reason is that cash infused into equity did not have to be amortized. Supervisory goodwill, on the other hand, was amortized on Talman's books at a rate of approximately $23.1 million per year.

---

10. Immediately prior to the Phoenix transactions, Talman had held assets of approximately $3.7 billion.

11. Unlike Green stamps, however, merely holding supervisory goodwill permitted Talman to maintain an expanded asset base.

The inequality of cash and supervisory goodwill is also demonstrated in the record. For example, the series of cash payments by FSLIC to Talman prior to its stock conversion in 1986 reflect this reality. It is true that each cash payment replaced an equal amount of supervisory goodwill. More telling, however, is the reason behind these payments. They were made because investors were unwilling to purchase common stock of a thrift whose entire net capital consisted of intangible supervisory goodwill and which had *negative* tangible capital of more than $300 million. FSLIC made the cash payments to reduce Talman's negative tangible capital to a level that eased investors' concerns and to thus enable the conversion to take place.

Moreover, Professor Christopher James, one of plaintiff's expert witnesses, reaffirmed the disparity of cash and supervisory goodwill. His "preferred stock model" estimated the cost of replacing supervisory goodwill with real capital. His model discounted the cost of dividend payments on preferred stock by more than $350 million to adjust for the benefit of real capital. Furthermore, on cross-examination, he readily conceded that replacement of supervisory goodwill remaining on Talman's books as of the date of the breach with cash of an equal amount would have overcompensated plaintiff.

Simply treating supervisory goodwill as cash or normal capital, in other words, is inappropriate. But treating it as if it had no value is equally unrealistic. If supervisory goodwill was worthless, why did Talman desperately try to replace it in 1990 and 1991? Why did FSLIC exchange it for cash in 1985 and 1986? Why did regulators permit the bank's regulatory capital ratio to reflect supervisory goodwill as if it were a tangible asset, capable of leveraging income-earning assets? In short, supervisory goodwill helped both the bank and the regulators in that it permitted Talman to stay open, and, it further helped the bank by giving it the opportunity to maintain a larger portfolio of assets and liabilities. Supervisory goodwill

was no less real, in other words, than the regulatory framework which made it possible.

The initial amount of supervisory goodwill became an accounting constant at the point Talman took over the four failing thrifts. The number was real enough from a regulatory and accounting standpoint at that moment in time. Admittedly, if a market valuation had been conducted the following week it would be only the rankest serendipity if the market value of the assets of those institutions was the same as it had been earlier. Nevertheless, it is important to bear in mind that Talman ultimately was able to use supervisory goodwill irrespective of whether it was needed to maintain minimal regulatory compliance. That was the bargain. Talman was able to use the earlier figure (adjusted for depreciation and FSLIC buy-backs) irrespective of its subsequent financial condition or subsequent fluctuations in the value of its portfolio. Treating it as if it had no value is thus fundamentally at odds with the agreement struck between Talman and the government in 1982.

*The Value of Leverage*

The assumption behind plaintiff's presentation is that one reason supervisory goodwill has value is that it permits leveraging, i.e., using this capital to attract disproportionately more in low-interest deposits, which in turn permit lending at higher yields. Defendant offered Professor Merton Miller, a Nobel Prize-winning economist,[12] to rebut this assertion.

Although Professor Miller may be a brilliant academic, his generalized theories bear little relation to the specific context of the savings and loan industry. For example, his assertion that leverage does not provide a thrift with any net benefit cannot be squared with the real world. Professor Miller testified that leverage exacerbates a company's potential losses as well as its profits. This is true. But his conclusion that leverage has no net value is based on the assumption that the probability of negative and positive interest rate spreads is equal, and hence that it is

---

**12.** Professor Miller was a joint recipient of the Nobel Memorial Prize in Economic Science in 1990.

equally likely that a thrift will garner negative and positive net earnings. Although there have been periods when the interest rate spread has been negative—the early 1980s is an obvious example—these periods are exceptions to the normal, positive spread that forms the foundation for the entire savings and loan industry. As Professor James testified, if a positive interest rate spread was not the norm, the thrift industry would not exist. Indeed, the industry is viable because positive interest rate spreads are the norm.

During trial, it became apparent that Professor Miller refuses to acknowledge this position because he cannot accept that supervisory goodwill had value. He testified: "Phasing out supervisory goodwill is not the same as taking a chicken farm. A chicken farm is a valuable asset." Tr. at 2098. Of course, if supervisory goodwill was not a valuable asset, there would have been no need for Talman to replace it either by issuing preferred stock or agreeing to be acquired by ABN AMRO. But that was not the case. Professor Miller's testimony was skewed by his refusal to recognize that supervisory goodwill *did* have value. Moreover, Professor Miller's hypothesis that leverage has no value, which underlies the first of the Modigliani & Miller [13] propositions, is premised upon numerous assumptions which he did not establish, including that capital markets are perfectly efficient and individual investors can borrow at the same rate as financial institutions. [14]

The court accepts Professor James' representation of the value of leverage. He has broad experience in the banking and S & L industries and has served as a director of a thrift, SunBank North Central Florida. [15] The court accepted him as an expert in corporate finance and, more particularly, as an expert with respect to the financing of financial institutions such as thrifts. In contrast, Professor Miller has had only peripheral experience in the area of savings and loan institutions and was not qualified as an expert with particular respect to the industry. [16]

Supervisory goodwill thus helped put Talman into regulatory compliance, and then, to the extent Talman had positive book value, in part due to supervisory goodwill, it could continue to leverage that book value into deposits and loans, the intermediation of which permitted it to make money. For every dollar of net positive book value attributable to supervisory goodwill, Talman was positioned to try to make money by leveraging that capital. The court thus rejects the government's contention that supervisory goodwill has no value.

The difficulty, however, is in devising a meaningful way to measure that value.

---

13. These propositions are widely known as the "M & M" propositions.

14. Professor Miller's testimony was marked by his disdain for the savings and loan industry. When asked about the use of the term "thrift" to refer to the industry, he responded: "[T]his is an industry which has blown away hundreds of billions of dollars of taxpayers money. This is thrift? This is waste." Tr. at 2151.

It was also clear that his testimony was shaped by his public policy goals. He testified:
[A]s a citizen, as a taxpayer and as an economist, I'm very concerned with the public policy issues that are involved in this case and similar cases like it, not just who wins or loses in this case, but I'm concerned that the government has the right incentives for making changes. The government being what it is, mistakes will be made, and when they are made, and the government tries to correct them, it should not be concerned about getting a whole bunch of like suits calling for what would amount to punitive damages, because if the costs of changing the government policy are inflated and are too big, well, then, the government will be deterred from making necessary and valuable changes ... in the social interest.... *Id.* at 2054–55.

15. He also served as the senior economic advisor to the Comptroller of the Currency in the early 1980s.

16. We found Professor Miller's testimony lacking in other respects. He was mistaken regarding Talman's financial situation at the time of FIRREA—the critical time period for Professor James' preferred stock model, in response to which Professor Miller was providing expert testimony. He testified that Talman had "on the order of 300 to 400 million" in supervisory goodwill (actually $514 million), and that Talman did not have negative tangible capital (in fact, Talman had negative tangible capital of over $200 million). Although Professor Miller is an eminent scholar in the area of finance, we did not find him to be a persuasive witness on the particular facts and issues relevant to this case.

Breach of the agreements forced the bank to mitigate or face dissolution. But it was impossible to mitigate with an identical asset. Talman could not go into the market place and obtain supervisory goodwill. Indeed, one of the ironies of this case is that plaintiff's economic distress caused it to obtain replacement capital in a way that ultimately made it more profitable than it would have been otherwise.

*The Impact of the Breach on Talman: Defendant's Event Study Analysis*

Defendant also contends that an analysis of the impact of FIRREA on the value of Talman's outstanding common stock demonstrates that no damages are due under any theory. To support this argument, David Ross, one of defendant's expert witnesses, testified that an event study of Talman's stock price in the two-week period surrounding the date of enactment of FIRREA demonstrates that plaintiff's market value increased as a direct result of the statute's enactment. During this period, there were several important events leading up to the passage of the legislation: the conference committee approved a compromise version of H.R. 1278 (the bill that became FIRREA); President Bush announced he would veto the bill, if passed by Congress, because he objected to the inclusion of the bill "on-budget;" the veto threat was lifted after this dispute was resolved; the House and Senate passed the bill; and, finally, the bill was signed into law. The price of Talman's stock increased from $8⅝ on July 27, 1989, to $10 on August 11, 1989 (two days after enactment of FIRREA). Defendant asserts that this stock price increase bars any award to plaintiff for the government's breach.

Defendant's argument is appealing in its simplicity: the court could calculate damages (or conclude there were no damages) by simply comparing plaintiff's stock price shortly before and after FIRREA. Nevertheless, we reject defendant's event study argument. It is flawed conceptually, and in its particular application here. The conceptual flaws are twofold. First, we decline to accept this novel method of determining damages for breach of contract, either as a method of determining quantum per se, or as means of refuting plaintiff's calculations of damages under standard contract damages theories. The court acknowledges that event studies are a widely used tool in the academic field of economics to assess the impact of an event upon the value of a company's stock. But courts have frequently adjudicated breach of contract claims involving companies that are publicly traded, and have done so without resorting to the use of event studies.[17] The government has failed to cite, and the court has been unable to find, any cases in which a court has adopted an event study to determine the quantum of damages for breach of contract.[18] We see no reason to depart from

---

17. Courts have measured damages for breach of contract by reference to stock prices where the securities formed the subject matter of the contract. *See, e.g., Gallagher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889); *Holland Furnace Co. v. Allen*, 118 F.2d 969 (6th Cir.1941). The cases typically arose where one party breached an agreement to sell or purchase stock at an agreed price. But in these cases, courts looked to stock prices only to determine the fair market value of the securities at the time of the breach or within a reasonable time thereafter. Stock prices were not used to measure the impact of the breach on plaintiffs' net worth (as measured by the change in their stock prices in the time period spanning the breach).

18. At least two federal district courts have accepted event studies to establish liability and the quantum of damages in securities class action and derivative suits, or rejected claims because they were not supported by an event study. *See, e.g., Goldkrantz v. Griffin*, No. 97 Civ. 9075, 1999 WL 191540 *3–*5 (S.D.N.Y. Apr. 6, 1999); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1025–26 (S.D.N.Y.1997); *In re California Micro Devices Sec. Litig.*, 965 F.Supp. 1327, 1333 (N.D.Cal.1997); *In re Seagate Tech. II Sec. Litig.*, 843 F.Supp. 1341, 1348, 1368 (N.D.Cal.1994); *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993). In these cases, plaintiffs alleged fraud-on-the-market: fraudulent misrepresentation or concealment of information regarding the defendant that improperly affected its stock price, to the injury of investors who were not aware of the fraud. Plaintiffs alleged they were harmed by purchasing stock at an inflated price, which they could not later recoup after the fraud was discovered. The courts considered event study analysis to support or refute plaintiffs' claims that stock price movements were caused by the fraudulent acts and to measure the quantum of damages.

One district court has considered an event study offered by a defendant to prove special damages on its trade libel counterclaim. *See*

over a century of precedent and from the guidance provided in every contract law treatise simply because Mr. Ross is sanguine that market valuations are infallible and can be applied in the context of a contract breach.

In part, our reluctance stems from an unwillingness to entrust the results in this case to the vagaries of the market. Although the stock market's valuation of a company may have more relevance to calculating damages than reading entrails, the court is unwilling to concede more. Stock prices provide a measure of investors' valuation of a company, or more precisely, the value of its net assets and the anticipated future earnings that a company will generate. But stock prices cannot reflect negative net worth.[19] They are also affected by factors other than changes in earnings forecasts. At the broadest level, Alan Greenspan, Chairman of the Federal Reserve Board, has cautioned against "irrational exuberance" of investors, which may lead to stock prices that cannot be justified by future earnings expectations. The stock market is subject to bubbles, corrections, and crashes that have little to do with the value of future earnings streams. Investors routinely switch their focus from one industry group to another—today's darling industry is tomorrow's goat. These fads cause stock prices within an industry to rise, only to fall once investors' focus moves to another group. We agree with this court's statement in *Glendale* that "short-term market effects can be caused by the most frivolous speculation." *Glendale*, 43 Fed.Cl. at 402 n. 5.[20]

For defendant's theory to make any sense, one has to assume that the market valuation is per se the correct one, i.e. that daily stock prices are always a rational function of the present value of a company's net assets and future earnings. We decline to make that assumption.[21] Courts which have adopted

*Computer Aid, Inc. v. Hewlett–Packard Co.*, 56 F.Supp.2d 526, 539–40 (E.D.Pa.1999). The defendant offered the study to show that its stock price declined on the day following the release of an allegedly defamatory press release and that the decline was caused by that release. The court expressed reservations about the use of event studies, noting that such studies assume that capital markets are perfectly efficient and that stock price changes are not distorted by illiquidity problems. The court held that, even assuming that the study revealed a statistically significant decline in Hewlett–Packard's stock price that could be attributed as the market's reaction to the press release, it failed to "provide the kind of direct evidence required on summary judgment to raise an issue of material fact on the issue of special damages." *Id.* at 540.

19. For example, as Dr. Jack Guttentag, one of defendant's expert witnesses, conceded, many publicly-traded thrifts had negative mark-to-market values in 1982 and were forecasted to suffer further losses, yet their stock prices were, of necessity, positive. Dr. Guttentag explained that share prices provide "the market value of the equity . . . , not the market value of the firm." Tr. at 2015. Stock prices do not reflect the real value of the companies under these conditions.

20. The court reached this conclusion after observing a dramatic rise in the price of Glendale's warrants after the judge made a comment midway through the trial that did not logically impact the size of Glendale's monetary recovery. *See Glendale*, 43 Fed.Cl. at 402 n. 5. The court did note, however, that "long-term market valuation is often a very reliable indicator of value."

We do not disagree, though the word "often" bears emphasis. For example, in the present case, Talman's stock price never closed above $6 between July 15, 1990 and July 15, 1991. This tells us, according to Ross, that the market valued Talman's future stream of earnings at less than $6 per share. Yet, in early July 1991, ABN AMRO offered $10 per share to acquire Talman in addition to a cash infusion of $300 million. Clearly, ABN AMRO believed that Talman's stock price significantly underestimated the true value of the company. The market reaction to the announcement of ABN AMRO's acquisition is also informative. Talman's stock closed at $9 on July 16, 1991, an increase of 64% in one day. Yet, forecasts of Talman's future earnings had not changed overnight.

21. We recognize that a plurality of Justices endorsed one form of the efficient market hypothesis in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). That opinion states that "the market price of shares traded on well-developed markets reflects all publicly available information." *Id.* at 246, 108 S.Ct. 978. This is a necessary assumption for the fraud-on-the-market cause of action. But it does not follow that stock prices are not affected by factors other than news that impacts companies' future earnings. *See supra* note 20 (discussing an overnight 64% increase in Talman's stock price unrelated to an increase in its forecasted earnings); *see also Computer Aid*, 56 F.Supp.2d at 540–41 (stating that "[u]nsystematic risk in the computer industry and investor sentiment may have affected that sector more tangibly than the company press release at issue").

event studies have done so, as far as we can tell, only in stockholder class action or derivative suits alleging fraud-on-the-market. *See supra* note 18. In these cases, plaintiffs are alleging that they were harmed by a company's manipulation of its stock price. Of necessity, damages in such cases are measured by the impact of defendant's alleged misrepresentation on the price of the stock. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154–55, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Executive Telecard*, 979 F.Supp. at 1025. Event studies are then used to establish that stock price fluctuations are not due to factors unrelated to the fraudulent conduct. *See Executive Telecard*, 979 F.Supp. at 1025. They are useful because they remove some of the arbitrariness of basing an award of damages on the movement of stock prices.

The nexus that exists between a defendant's alleged wrong and a plaintiff's stock price in the context of a fraud-on-the-market suit does not exist when it comes to breach of contract. The plaintiff is not a stockholder. Its cause of action does not allege that the defendant's breach detrimentally impacted its stock price. There is no need, therefore, to wade into the murky waters of stock price analysis and, consequently, no need to seek refuge in event study analysis. We decline defendant's suggestion to add additional uncertainty to what is already an imprecise calculation. *Cf. Glendale*, 43 Fed.Cl. at 402 n. 5 (noting that event studies are "speculative and unreliable" in the context of the enactment of FIRREA).

The second conceptual flaw in Ross' approach relates to his study of the impact of FIRREA as a whole, rather than focusing on the one provision that plaintiff alleges effected the breach. The statute did far more than require OTS to phase-out the use of supervisory goodwill as regulatory capital. For example, one provision of FIRREA authorized bank holding companies to acquire savings and loans. *See* Pub.L. No. 101–73 § 601, 103 Stat. at 408–09 (codified at 12 U.S.C. § 1843(i)). Plaintiff concedes that it benefitted from this provision, and from other provisions in the statute. In fact, plaintiff concedes that FIRREA as a whole may have

done it more good than harm. But that fact is not a bar to a breach of contract claim. Here, plaintiff alleges that it was harmed by the provision relating to supervisory goodwill, not by FIRREA in its entirety. Defendant's argument assumes that a party is not entitled to *all* the benefits of a multi-faceted contract. Even if some of the non-breached aspects of the 1982 and 1986 contracts worked out well, plaintiff is not precluded from insisting on full performance. The fact that plaintiff received benefits from other aspects of the contract may be relevant to a restitution analysis and in determining whether profits on the contract as a whole were lost, but it is not a general defense. What is missing in Ross' analysis is a recognition that things might have been even better absent the breach.

One other methodological flaw precludes the use of event study analysis in this breach setting: it cannot take into account several potentially significant complicating factors that would distort the impact of the new capital standards on Talman's stock price. The first wrinkle concerns the applicability of FIRREA's capital standards to Talman. Talman had been operating under forbearances granted by FSLIC and FHLBB since the early 1980s. Investors' reasonably may have assumed that OTS would allow Talman to operate indefinitely, even though not in compliance with these standards. Indeed, FIRREA provided a procedure for OTS approval of capital plans submitted by noncompliant thrifts. *See* 12 U.S.C. § 1464(s)(4)(A), (t)(6)(A)(ii). Although these provisions require a thrift to set out a plan for increasing capital, they do not specify a cut-off date for achieving capital compliance. Investors may have calculated that Talman would be permitted to continue operating as if its supervisory goodwill were still treated as capital. Indeed, this scenario materialized, at least until June 1991, when OTS informed Talman that it had to attain capital compliance by the end of that year.

Another potential wrinkle, related to the first, is that investors may have contemplated that OTS would exempt thrifts with supervisory goodwill from complying with

FIRREA's capital standards.[22] A further distorting factor relates to the likelihood and expected success of legal action by Talman against the government for breach of contract. Professor James testified that where a plaintiff has a possibility of receiving damages for the breach of contract, this potential recovery must be factored into an event study analysis. The premise underlying defendant's argument is that Ross' study measures investors' reactions to the news of the breach and incorporates their informed judgment on the impact of the breach on Talman. This assumes that investors (1) were fully aware of Talman's pre-existing contractual arrangement with the FHLBB regarding treatment of supervisory goodwill; and (2) recognized that the government would not honor this agreement after FIRREA (either by grandfathering some thrifts, or permitting indefinite noncompliance) and thus breached the contract. If, on the other hand, investors expected Talman to receive compensation for the breach, the impact on Talman's stock price would be cushioned. Ross' study does not account for these factors.

There are also several flaws in the manner in which Ross conducted his analysis, which would be sufficient on their own to prevent our use of his study. Three steps are required to develop a reliable study: (1) dates must be selected on which significant information relating to the event was released publicly; (2) stock price movements of the target company must be filtered to remove fluctuations that are attributable to the general market;[23] and (3) the resulting data must be screened to determine if price changes are statistically significant. *See Oracle*, 843 F.Supp. at 1348. We see flaws in each of these areas.

With regard to the first step, Ross' selection of a two-week window from July 27 to August 11, 1989 is both under- and over-inclusive. He chose this time period because he assumed that the enactment of FIRREA constituted the breach, and because this window spans the period "when substantial uncertainty as to whether FIRREA would become law was resolved." Tr. at 1770. His assumption regarding the date of the breach is inconsistent with prior rulings in *Winstar* and related cases. In its *Winstar* opinion, the Federal Circuit held that

> [T]he application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach of the FSLIC's and the Bank Board's agreements....
>
> ....
>
> After FIRREA and its implementing regulations, the bank regulatory agencies limited [supervisory goodwill and capital credits] as acceptable regulatory capital and limited the amortization periods. As a

---

**22.** Roberts testified that he had this expectation, *see* Tr. at 215–16, 438, as did Donald Haider, an independent director on Talman's board appointed by FSLIC. *See* Tr. at 917. Although the text of the statute includes no such grandfathering provision, OTS contemplated this possibility while drafting its regulations to implement FIRREA. After some consideration, however, it abandoned this idea: "While FIRREA arguably provides the Office with the flexibility to grandfather certain goodwill as a component of supplementary capital, and such grandfathering would be consistent with the current OCC [Office of the Comptroller of the Currency] rules, the Office believes that such a position would not conform with congressional intent." OTS, Regulatory Capital, 54 Fed.Reg. 46,845, 46,858 (Interim final rule, Nov. 8, 1989). Existing OCC regulations grandfathered pre–1985 goodwill, permitting it to be counted as capital. *See id.*

Even after OTS' final rules took effect on December 7, 1989, doubt remained as to whether the capital standards applied to the thrifts with supervisory goodwill. To quash these concerns, the agency issued a Bulletin on January 9, 1990 explicitly stating that section 301 of FIRREA eliminated existing forbearance arrangements. *See* Capital Adequacy: Guidance on the Status of Capital & Accounting Forbearances & Capital Instruments Held By a Deposit Insurance Fund, OTS Thrift Bulletin 38–2, *available in* 1990 WL 309397 (Jan. 9, 1990); *see also Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 179 (1997).

**23.** Generally, it is also necessary to eliminate industry-wide influences on the target company's stock price by use of an industry index. *See Oracle*, 843 F.Supp. at 1348. Because FIRREA impacted the entire thrift industry, however, this step would eliminate the movement that Ross was seeking to measure. It was thus reasonable for Ross to skip this step.

result, Winstar and Statesmen were immediately thrown into noncompliance with the new *regulatory* capital requirements.... *Winstar Corp. v. United States,* 64 F.3d 1531, 1544 (Fed.Cir.1995) (emphasis added), *aff'd,* 518 U.S. at 870, 116 S.Ct. 2432 ("We accept the Federal Circuit's conclusion that the government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA ... the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' new worth") (emphasis added).

The higher courts' rulings in *Winstar* are consistent with this court's holding on this issue. *See Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 179, 182–84 (1997) ("*Winstar Plaintiffs* ") (holding that the enactment of FIRREA constituted an anticipatory breach; the actual breach occurred either when OTS' regulations implementing FIRREA took effect or when OTS published Thrift Bulletin 38–2), *aff'd in part on other grounds, Ariadne Fin. Servs. Pty.* *Ltd. v. United States,* 133 F.3d 874 (Fed.Cir. 1998), *aff'd in part on other grounds, Shane v. United States,* 161 F.3d 723 (Fed.Cir. 1998).[24] Given these precedents, we can only conclude that defendant breached the contract, at the earliest, on December 7, 1989, the effective date of the implementing regulations.

Ross' study thus fails to consider Talman's stock price at the time of the breach. It also fails to consider stock price movements on or around significant dates leading up to the passage of FIRREA, or following FIRREA during the period when OTS was implementing the statute. In the former category, each of the six published studies referred to by Ross looked at numerous dates prior to August 1989.[25] Although none of these dates are obligatory, it appears somewhat arbitrary to trumpet the accuracy of these studies and then fail to consider data from the majority of dates selected in them, especially dates found by the studies to yield statistically significant reactions in thrift stock prices.[26]

**24.** In *Ariadne* and *Shane,* the Federal Circuit affirmed this court's holding that each of these plaintiffs' claims were barred by the statute of limitations because they were filed more than six years after January 9, 1990, the date of publication of OTS Thrift Bulletin 38–2. *See Ariadne,* 133 F.3d at 876; *Shane,* 161 F.3d at 726. Implicitly, both of these decisions affirmed that the breach occurred on or before that date, but neither was required to reach a holding on the date of the breach with any greater precision.

In dicta, *Shane* stated that "repudiation occurred by means of each of the three government actions—the enactment of FIRREA, the promulgation of implementing regulations, or the publication of the [OTS] bulletin." 161 F.3d at 726. It noted also that "the Supreme Court did not clearly decide whether the breach occurred when the FIRREA was enacted or when the regulations ... became effective, or when the OTS bulletin ... was published." *Id.* at 727. Notwithstanding these comments, the court holds that the issue was resolved, at least in part, by the Federal Circuit's decision in *Winstar,* where the court held that the implementing regulations, not the statute, constituted the breach. *See Winstar,* 64 F.3d at 1544–45; text *supra.*

**25.** These six studies include one then-unpublished article, which was recently published. *See* Leonard Bierman et al., *On the Wealth Effects of the Supervisory Goodwill Controversy,* 22 J. Fin. Research 69 (1999).

**26.** The first study examined ten dates and found six that were significant for savings and loans: February 7 and 15, April 19 and 28, May 25, and August 9, 1989. *See* Sridhar Sunderam et al., *The Market Valuation Effects of FIRREA,* 16 J. Banking & Fin. 1097, 1108, 1113 (1992). The second study examined eight days and found three to be statistically significant: February 3, May 24, and August 3, 1989. *See* Jeff Madura et al., *Market Reaction to the Thrift Bailout,* 17 J. Banking & Fin. 591, 600 (1993). The third study concluded that four of ten days studied produced significant investor reactions: April 19, May 25, August 5 and August 9, 1989. *See* Iqbal Mansur & Elyas Elyasiani, *An Examination of the Impact of the 1989 FIRREA on the Mkt. Value of Commercial Banks & Savings & Loans,* 4 Applied Fin. Econ. 11, 15, 16 (1994). In the fourth study, two dates (of nine studied) elicited significantly reaction: August 3 and August 9. *See* James R. Barth & William N. Pugh, *FIRREA & the Savings & Loan Indus.: Was There a Wealth Effect?,* 31 Mid-Atl. J. Bus. 271, 278–79 (1995). The fifth study examined eleven dates and found four to be statistically significant: January 27, April 28, August 8 and August 10. *See* Babu Baradwaj et al., *Some Evidence on the Differential Impact of FIRREA on Savings & Loan Ass'ns,* Int'l J. Bus. Res., Fall 1995, 1, 8–9. The final study examined three dates: April 6, April 28, and May 25, 1989. It found only a marginally statistically significant movement on one date, April 6, 1989. *See* Bierman et al., *supra* note 25, at 82.

The results obtained from these six studies show a marked discordance. Each study considered a different sample of thrifts. But they all

Regarding post-FIRREA dates, we cannot understand how the dates of issuance of either the OTS implementing regulations or OTS Bulletin 38–2 would not be relevant.[27]

Other errors in Ross' study relate to the second and third steps. There is no evidence in the record that Ross adjusted Talman's stock price data to account for movements in the market as a whole. He did prepare two charts, comparing (1) the performance of Talman's stock with the performance of the savings and loan thrift index; and (2) the performance of the savings and loan thrift and bank indices. These charts covered the period from July 27, 1989 to July 31, 1991 (shortly after the announcement of the ABN AMRO merger), but he did not isolate data for the two-week window of the event study, nor did he use the data from these indices to adjust the data for Talman's stock during the window. *Cf. Seagate,* 843 F.Supp. at 1348.

Nor did Ross perform a statistical analysis of the movement of Talman's stock price.[28] Instead, we have little before us but an assertion that an increase from $8⅝ to $10 must be due to FIRREA. Without further analysis to remove market background noise and statistical analysis, this assertion is of little value.[29] *See Computer Aid v. Hewlett–Packard Co.,* 56 F.Supp.2d 526, 540–41 (E.D.Pa. 1999) (concluding that an event study was "dubious" because it focused on "stock price changes, not the statistical and qualitative

significance of those changes"); *Oracle,* 829 F.Supp. at 1181 (noting that "the reliability of the magnitude and direction of [the expert's] value estimates are incapable of verification" absent evaluation for statistical significance); *see also Goldkrantz,* 1999 WL 191540 at *4–*5 (adopting an expert's report that found that stock price changes on event days were not statistically significant and rejecting the report of an expert who performed no statistical analysis); *Seagate,* 843 F.Supp. at 1348, 1368 (accepting an expert's report that found that stock price changes on event days were not statistically significant).[30]

*Talman's Market Capitalization as a Cap on Plaintiff's Damages*

A related defense argued by defendant is that Talman's market value at the time of FIRREA provides a cap on plaintiff's recovery of damages under this theory. Ross testified that, based upon Talman's stock price of $8⅝ on July 27, 1989, plaintiff's damages are limited to $85 million.[31]

Defendant cites no authority for this limitation other than Ross' testimony, nor has the court found any. There is no apparent reason why a plaintiff's damages should be limited by the market capitalization of the company, outside the context of a shareholder lawsuit. In that specific context, shareholders' liability is limited to their investment

---

identified dates (albeit different ones) before August 1989 that were statistically significant.

**27.** We note that Talman's stock price plummeted shortly after the enactment of FIRREA and prior to the publication of OTS' interim regulations. On October 11, its stock price peaked at $10½; it declined to $7⅞ by the end of 1989 and reached a low of $2¾ on September 27, 1990. *See* Pl.'s Ex. 404.

**28.** In answer to a question on cross-examination, Ross stated that he had performed such analysis "generally." In reply to a follow-up question, he conceded that this "analysis" derives from reviewing five published academic studies of the impact of FIRREA on thrifts. *See* Tr. at 1778. We take from this that he assumed, because these studies claimed to identify statistically significant market reactions, that no further statistical analysis of Talman's data was required.

**29.** Ross testified that he attempted to remove "noise" by selecting an event window in which no other news relating to Talman was dissemi-

nated to investors. He did not conduct an analysis of the statistical significance of Talman's stock price move.

**30.** We note that the record does include some pricing data relating to Talman's stock that has been subjected to statistical analysis. The Madura study analyzed Talman's stock price data for four dates: January 4, May 24, August 3, and August 9, 1989. *See* Madura et al., *supra* note 24, at 602–04. Talman's stock price rose on each of these days, but on none of them was the movement statistically significant. *See id.* at 603.

**31.** It is unclear why Ross selected July 27 as the relevant date. On August 9, 1989, the date FIRREA was signed into law, Talman's market capitalization was $92.2 million. If December 7, 1989, is accepted as the date of breach, the stock price of $7⅞ on that date yields a damages ceiling of $74.0 million.

in the company, which is measured by the market capitalization of the company at the time of stock issuance (calculated by multiplying the number of outstanding shares by the share price). *Cf. Far West Federal Bank v. OTS,* 119 F.3d 1358, 1367 (9th Cir.1997) (affirming restitution award in the amount of investors' investment in a thrift, as measured by the amount paid for the thrift's shares); *RTC v. FSLIC,* 25 F.3d 1493, 1505 (10th Cir.1994) (same). This methodology has never been employed to limit damages in the context of a breach of contract claim brought by a corporate plaintiff, as far as the court is aware. We see no reason to extend this concept to the case at hand, and decline to do so.

We now turn to a more particularized examination of plaintiff's three theories of recovery. Each has its problems, either in the applicability to the peculiar facts of this case, the manner of application to these facts, or in quantification.

## III. Lost Profits

■ Plaintiff's first damages theory seeks recovery of profits foregone because of the enactment of FIRREA. A lost profits approach is potentially the theory that is best tailored to the circumstances of this case. Lost profits are a form of expectancy damages and serve to protect a plaintiff's interest "in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." *Restatement (Second) of Contracts* § 344(a) (1981). Lost profits damages thus serve to provide a plaintiff with those earnings that it would have realized absent the breach. Lost profits are measured by calculating the additional earnings that a plaintiff would have earned but for the breach. An accepted method of measuring past lost profits is to subtract a plaintiff's actual earnings from the estimated earnings that it would have earned absent the breach. *See, e.g., United States v. Behan,* 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884); *Cotton Bros. Baking Co. v. Industrial Risk Insurers,* 941 F.2d 380, 384 & n. 3 (5th Cir.), *modified,* 941 F.2d 380 (5th Cir.1991), *cert. denied,* 504 U.S. 941, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992); *see also*

*Restatement (Second) of Contracts* § 347(a) & cmt. b (stating that "the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered"). The minuend of the calculation thus consists of what the company can demonstrate with some reasonable certainty that it would have earned, but for the breach. The subtrahend is simply what actually occurred.

In this case, plaintiff claims that the loss of ability to count supervisory goodwill as regulatory capital hindered its ability to reap profits by generating spread income on an expanded portfolio of assets. Reduced to its most general level, plaintiff claims that, absent the breach, it would have expanded its asset base more quickly (through a merger-conversion with Cragin in 1990) and would not have had to shrink its asset base by $1 billion in 1991 to comply with OTS' capital compliance deadline. Plaintiff claims that this shrink in assets was permanent. Plaintiff also asserts other, smaller items of lost profits.

At the outset, the court notes that, although it agrees with plaintiff that lost profits are a valid measure of damages in these cases, it comes to a very different result than the one offered by the bank. There are two reasons. The first is that the plaintiff's calculation of lost profits (the "minuend" of the equation) includes items which the court finds are unsupported. The second is that the subtrahend in plaintiff's model erroneously omits substantial actual earnings.

■ The standard for lost profits in this circuit has been stated as follows:

In order to recover lost profits as damages for breach of contract, it must first appear that such loss is the immediate and proximate result of the breach. It must also be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of

some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into. Finally, there must be established a sufficient basis for estimating the amount of profits lost with reasonable certainty.

*Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 58, 115 F.Supp. 701, 714 (1953).

As a threshold matter, defendant raises an objection that Federal Circuit precedent precludes recovery of lost profits attributable to the general operations of a company where liability arises from the breach of a specific contract. Moreover, defendant argues that plaintiff cannot recover any lost profits because it was not reasonably foreseeable at the time of contracting that plaintiff would achieve profitability, and thus be in a position to recover lost profits damages. As a third line of attack, defendant challenges each of the positive elements of plaintiff's lost profits claim on a variety of grounds. Finally, defendant contends that any lost profits must be offset by the benefits accruing to Talman from its acquisition by ABN AMRO, which, it asserts, would not have occurred but for the breach.

### A. Recovery of Lost Profits Subsequent to *Wells Fargo Bank v. United States*

Defendant argues that recovery of lost profits in *Winstar* cases is inconsistent with the Federal Circuit's holding in *Wells Fargo Bank v. United States,* 88 F.3d 1012 (Fed. Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997). Defendant asserts that *Wells Fargo* precludes any recovery of lost profits allegedly resulting from a reduction in regulatory capital. The court disagrees.

Defendant has dramatically over-read the holding of *Wells Fargo.* The court in *Glendale* has addressed this precise issue and points out that *Wells Fargo* stands for the unremarkable proposition that gains which do not flow proximately out of the undertaking of the contract itself are too speculative. *See Glendale,* 43 Fed.Cl. at 397–98. Here, unlike *Wells Fargo,* the claimed lost profits are asserted to arise from the very subject of the breached portion of the contract—the lost supervisory goodwill. Although the types of damages sought in *Wells Fargo* may be comparable to those sought here, the difference is that in that case there was no direct connection between the alleged damages and the government's obligation, which was merely to provide a loan guarantee.

Moreover, to the extent that defendant cites *Wells Fargo* for the proposition that lost profits damages in the *Winstar* cases cannot be shown with reasonable certainty, the court disagrees. Lost profits, once established, need not be proven with complete precision. The "reasonable certainty" test allows some flexibility. On this aspect of the lost profits analysis, the *Restatement* provides:

> The requirement does not mean ... that the injured party is barred from recovery unless he establishes the total amount of his loss. It merely excludes those elements of loss that cannot be proved with reasonable certainty.... Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred.... Damages need not be calculable with mathematical accuracy and are often at best approximate. *This is especially true for items such as loss of good will as to which great precision cannot be expected.*

*Restatement (Second) of Contracts* § 352, cmt. a. (emphasis added) (citation omitted).

### B. Foreseeability of Talman's Operating Profits

Defendant further argues that, even if *Wells Fargo* does not preclude plaintiff's recovery of lost profits *per se,* in the particular circumstances of this case FSLIC could not reasonably have foreseen that Talman (and later, LaSalle Talman) would become profitable. It contends that the financial condition of Talman was so poor in 1982 that FSLIC envisaged the supervisory mergers as a delaying tactic, not a permanent solution. According to the government, FSLIC created the Talman Phoenix purely to defer an imminent collapse of the five thrifts; their demise

was inevitable. Consequently, Talman's return to profitability was an unexpected surprise. The court disagrees.

FSLIC's own documents reveal that the regulators expected Talman to achieve viability. They expected Talman to return to profitability and, more significantly, to be able to amortize the supervisory goodwill over the course of the contracts. They expected Talman to work through the problem loans acquired from Unity and Peoria. Undoubtedly, this turnaround would require a significant and favorable downward movement in interest rates, but FSLIC expected that to occur.

The minutes from the FSLIC meeting on February 19, 1982 reflect these expectations. In that document, a member of FSLIC's quantitative analysis section indicates that an analysis of the proposed mergers under FSLIC's viability model concluded that Talman would turn the corner and become profitable on an economic basis within seven years. A memo presented on the same day and authored by Mr. Brent Beesley, FSLIC's director at the time of the 1982 supervisory mergers, notes that with the benefit of purchase accounting, economies of scale, and a hoped for relaxation of interest rates, the danger of default would be avoided and Talman would become a viable institution. Mr. Beesley's trial testimony confirmed that at the time of the mergers FSLIC expected Talman to survive the crisis and emerge as a viable institution. In addition, Dr. Jack Guttentag, an expert witness appearing for the government, testified at trial that the assumptions built into the February 1982 agreement between FSLIC and Talman indicated that FSLIC at the time believed Talman had a reasonable chance of survival after completion of the supervisory mergers.

The parties plainly anticipated, therefore, that Talman would be a survivor. And that, at least for a time, supervisory goodwill would be essential to maintain survival and to permit the bank to do what it does to make money—namely, intermediate funds. It should have been equally foreseeable to the parties at the time they entered into these agreements that curtailment of supervisory goodwill could render the thrifts noncompli-

ant with capital requirements, and, to the extent they could not mitigate by obtaining other capital, either put them out of business altogether or shrink their operations.

In the case of Talman, it did not obtain replacement capital until 1992. Not inappropriately, it puts forward a claim that it suffered losses during the two years before the ABN AMRO acquisition, and, because it does not acknowledge that mitigation was complete, it seeks continuing lost profits despite the acquisition.

The court also holds that the general type of lost profits claimed-income lost due either to shrinkage of the bank's deposit and loan bases, to lowered returns on ongoing aspects of its business, or to having to abandon profitable lines of business—should all have been within the contemplation of the parties. The court is also willing to accept the proposition that Talman's inclination to seek out merger and acquisition opportunities was generally understood at the time, and therefore, that curtailment of an ability to enter into mergers or acquisitions potentially could cause loss of income. As explained below, however, while the plaintiff has established the general foreseeability of these types of damages, some of the specific elements of claimed lost profits fail for other reasons.

### C. Alleged Errors in Dr. Baxter's Calculation of Lost Profits

As an initial matter, we must address defendant's contention that plaintiff is precluded from recovering any lost profits because its annual earnings after the breach exceeded those before the breach by a substantial degree. This argument has no merit because the quantum of plaintiff's actual earnings are irrelevant in a lost profits analysis—actual earnings serve solely as the baseline against which projected earnings are compared. Plaintiff is entitled to lost profits if it can show that its earnings would have been higher absent the breach, regardless of the comparative size of its post-breach actual earnings. Accordingly, plaintiff's claim for lost profits cannot be denied simply because Talman enjoyed significant earnings in recent years. The question is: absent the breach, would those increases have been greater?

Nevertheless, the lost profits model presented by plaintiff's expert, Dr. Nevins Baxter, contains significant flaws. Dr. Baxter's analysis is divided into two parts: past lost profits and future damages. His calculation of past lost profits does not follow the standard methodology. Instead of subtracting Talman's actual earnings from estimated earnings in the but-for scenario, he creates two fictional banks and derives lost profits by subtracting the earnings of one from the other.

Dr. Baxter's calculus for lost profits consists of the earnings of what he calls the "But–For Bank," which represents plaintiff as it would have existed absent the enactment of FIRREA, less the earnings of "Old Talman," which represents plaintiff after the breach, but without the earnings attributable to cash contributed by its parent, ABN AMRO. Unlike the traditional model, therefore both of the numbers in Dr. Baxter's presentation are hypothetical, although the beginning point for both elements of the calculation of the earnings for the two fictional banks is plaintiff's actual earnings from the date of the breach until the present. The difference between Old Talman's earnings and those of the But–For Bank between 1989 and the present totals $601.5 million. In addition, for each of these years, he calculates foregone interest savings—interest that plaintiff would not have paid if it had used the foregone lost profits to reduce interest-bearing liabilities. According to Dr. Baxter, this reduced interest expense is $58.9 million. Adding this figure to the foregone income yields $660.4 million in "total lost profits" up to the present.

Rather than project those losses into the future, Dr. Baxter's report calculates future lost profits by incorporating a calculation of future damages prepared by Professor James, plaintiff's other expert witness. James bases his calculation on the cost of replacing the supervisory goodwill that would have existed on December 31, 1998, absent the breach—$306.1 million—with real capital, through the issuance of preferred stock. Using this methodology, and assuming a preferred stock dividend rate of ten percent, Professor James calculates future damages

to be $198.4 million. We discuss this aspect of plaintiff's lost profits model *infra* following our discussion of plaintiff's cost of replacement capital theory. Dr. Baxter adds this figure to his assessment of past lost profits to generate a combined lost profits damages total of $858.8 million.

Dr. Baxter derives Old Talman's earnings by subtracting three elements from the baseline of plaintiff's actual earnings subsequent to the breach: (1) earnings of Home Savings' branches after that company was merged with LaSalle Talman in 1994; (2) earnings attributable to Cragin after its merger with LaSalle Talman in 1995; and (3) earnings of Bell Savings branches after the merger in 1997. The reason he gave for these adjustments was the recreation of the earnings of Talman after the breach without the mitigating benefits attributable to ABN AMRO.

Earnings of the But–For Bank are calculated in a similar way, only this time to show the earnings plaintiff would have realized without FIRREA, i.e., if it had retained its ability to count supervisory goodwill and had not been acquired by ABN AMRO. Starting again from the baseline of plaintiff's actual earnings, Dr. Baxter derives the But–For Bank's earnings by making six adjustments. He subtracts the earnings attributable to ABN AMRO's $300 million cash infusion and to the branches acquired from Bell Savings in 1997. He then adds four elements: Cragin's earnings from 1990 (the date plaintiff would have merged with Cragin absent the breach) through November 1995 (the date of the merger between LaSalle Cragin and LaSalle Talman); estimated foregone earnings from mortgage servicing for the period 1990–1992; estimated lost profits from the $1 billion shrink from 1992 through 1998; and "wounded bank" damages, i.e. damages incurred in 1990, 1991 and 1992 because plaintiff was not in compliance with FIRREA's capital requirements.

Plaintiff's past lost profits for each year are then calculated by subtracting the earnings of Old Talman from those of the But–For Bank. The net effect is that plaintiff's actual earnings and the earnings attributable to Bell Savings' branches drop out, and its past lost profits condense into six elements:

(1) earnings from the Home Savings branches (after 1994); (2) Cragin's earnings (from 1990 through 1998); (3) foregone mortgage servicing earnings; (4) lost profits from the $1 billion shrink; (5) wounded bank damages; and (6) (subtracted from the sum of the other five elements) earnings on the $300 million cash infusion. Defendant raises objections to almost every element of Dr. Baxter's past lost profits calculation.

### 1. Adjustments to Plaintiff's Actual Earnings

Defendant's primary objection, at least in terms of its potential impact on plaintiff's recovery, is that Dr. Baxter created the fictional entity of Old Talman, rather than using plaintiff's actual earnings after the breach, which had the effect of including earnings attributable to Home Savings and Cragin in his calculation of damages. Dr. Baxter made three adjustments to plaintiff's actual earnings to arrive at earnings for Old Talman—he deducted the earnings attributable to the branches of Home Savings, Cragin, and Bell Savings after their mergers with plaintiff. Every dollar deducted from plaintiff's actual earnings has the effect of increasing its lost profits by an equal amount.[32] Defendant argues that there is no justification for diverging from the standard method of calculating lost profits damages, especially here, where it would result in plaintiff recovering as damages more than $300 million in earnings that it has already received.[33] We agree that Dr. Baxter's creation of Old Talman and the corresponding adjustments to plaintiff's actual earnings are unjustified.

Dr. Baxter gave two explanations for this deviation from the standard practice of using actual earnings. First, Talman could not have merged with these other thrifts following the breach without more than $600 million in cash payments by ABN AMRO, and thus the benefit of plaintiff's enhanced earnings, which arose solely from Talman's efforts to mitigate the effects of the breach, should not be considered. Second, Talman was not charged by ABN AMRO for these cash payments and thus an adjustment should now be made to actual earnings to account for this cost. Although the court accepts the factual predicates behind these justifications, we cannot accept Dr. Baxter's conclusion that they justify reducing plaintiff's actual earnings; indeed, quite the opposite.

The parties agree on the financial aid provided by ABN AMRO for the three post-breach acquisitions: $134 million was funneled to LaSalle Talman in November 1994 to enable it to acquire Home Savings; ABN AMRO paid $488.9 million in cash to acquire all of Cragin's outstanding stock in June 1994, prior to merging the resulting institution, LaSalle Cragin, into LaSalle Talman in 1995; and ABN AMRO provided LaSalle with $167.5 million in cash to acquire Bell Savings in 1997. As a result of these acquisitions, plaintiff's assets and earnings swelled significantly. Dr. Baxter testified that the breached bank, Talman, could not have funded these acquisitions without the help of ABN AMRO.

■ This may be true, but it is irrelevant here. Where a plaintiff seeks to measure lost profits using anticipated earnings from its entire enterprise rather than a specific contract, as here, that calculus must subtract plaintiff's *actual* earnings from the projected earnings. *See Cotton Bros.*, 941 F.2d at 384

---

32. The three adjustments are claimed as deductions from actual earnings under the Old Talman half of Dr. Baxter's model. Because Dr. Baxter derived lost profits by subtracting Old Talman's earnings from those of the But–For Bank, a double negative results, causing the three adjustments to become positive elements of plaintiff's lost profits calculation.

33. This figure is derived from Dr. Baxter's estimate of the earnings attributable solely to Home Savings and Cragin subsequent to their mergers with plaintiff. Defendant has not alleged that

plaintiff erroneously deducted Bell Savings' earnings from LaSalle's actual earnings in 1998, apparently because this element was offset by an identical adjustment to the But–For Bank's earnings, and thus dropped out of Dr. Baxter's calculation. Defendant's argument logically should apply with equal force to Dr. Baxter's adjustment for Bell Savings in his calculation of Old Talman's earnings. Accordingly, plaintiff's lost profits damages for 1998 should be reduced by the amount of Bell Savings' earnings in that year. That datum is not in the record, however.

n. 3; *cf. Restatement (Second) of Contracts* § 347 cmt. b. Although plaintiff is correct that its actual earnings were augmented through its acquisition by ABN AMRO (which served as Talman's principal means of mitigating its damages after the breach), the benefit of these increased earnings was received by plaintiff and must be accounted for. *See Restatement (Second) of Contracts* § 347(c) & cmt. e. ("If [the injured party] makes an especially favorable substitute transaction, so that he sustains a smaller loss than might have been expected, his damages are reduced by the loss avoided as a result of that transaction."). Yet, Dr. Baxter's model excluded the earnings attributable to the three post-breach mergers—earnings that plaintiff actually received—by creating the fiction of Old Talman. In effect, Dr. Baxter has modified the standard lost profits calculus to remove the benefits plaintiff accrued from its mitigation effort. The court rejects plaintiff's alternative approach to calculation of lost profits.

Dr. Baxter's second justification also fails. The argument, apparently, is that because the cash payments to plaintiff were made as "gifts," Tr. at 998, 1041, which were not charged to LaSalle Talman or LaSalle by ABN AMRO, plaintiff's actual earnings must be reduced to prevent an understatement of its lost profits. The court does not understand why plaintiff, having received cash from its parent which was then used to generate additional earnings, should be entitled to deduct these earnings from actual earnings and thus increase its recovery here. As Dr. Baxter testified, these acquisitions could not have been funded by Talman. The fact that the new bank was able to do so is a beneficial effect of the mitigation effort and it cannot be ignored. These "gifts" were part of its actual experience post-FIRREA. The full benefit of the takeover must be considered in the damage evaluation.

Accordingly, we hold that Dr. Baxter's creation of the fictional bank dubbed Old Talman was not justified. Plaintiff is required to use its actual earnings in the calculation of lost profits for each year.

### 2. Calculation of the But–For Bank's Earnings

Defendant challenges numerous aspects of Dr. Baxter's calculation of the earnings of the But–For Bank. We agree that significant adjustments are required.

#### a. The Abandoned Merger–Conversion with Cragin

 Defendant contends that Roberts' suggestion that a merger-conversion with Cragin would have occurred at year-end 1989, absent FIRREA, is a rose tinted recollection of events, shaded perhaps to meet the needs of this litigation—it is far too speculative to form the basis of an award of lost profits. Although we disagree in large part with the former criticism, the court, in substance, agrees with the latter conclusion.

First, the court cannot accept that it was foreseeable to FSLIC that a probable result of a breach would be a forsaken merger-conversion with another thrift, as opposed to a straight merger. It is true that the record supports plaintiff's contention that Talman had conducted a number of acquisitions or mergers prior to 1982. *See* Pl.'s Ex. 138 at 2 (identifying four mergers between 1974 and 1982). Undoubtedly, the regulators were aware of each of these transactions because regulatory approval was sought and obtained in each case. Nevertheless, this past history does not prove that FSLIC should have foreseen, in 1982,[34] a merger-conversion between Talman and Cragin in 1989. Defendant's arguments on this point are persuasive. Given Talman's past history, FSLIC could have foreseen that Talman would, once it weathered the storm of high interest rates and re-established a pattern of earning steady profits, have re-commenced its strategy of growth by acquisitions. But it does not follow that a merger with a thrift of Cragin's size, and by means of a merger-conversion,

---

**34.** The court accepts defendant's argument that February 19, 1982, the date of the first supervisory mergers, is the appropriate date from which foreseeability should be determined. We note, however, that this position is inconsistent with its position, presented in response to plaintiff's restitution claim, *see infra* § V, that the date of the 1986 agreement is controlling because that agreement replaced the 1982 contracts.

was foreseeable in 1982. The specific circumstances of the proposed merger must be considered.

None of Talman's acquisitions prior to 1982 had involved a thrift approaching the size of Cragin, which held assets of over $2.3 billion at year-end 1989. Its largest acquisition had been a merger with Home, which had assets of less than $860 million, in 1980. A second factor weighing against foreseeability is the mechanism by which the Talman–Cragin merger allegedly would have taken place. As of 1982, there had never been a merger-conversion of two thrifts because FHLBB regulations did not then allow that form of conversion. Regulations permitting merger-conversions were promulgated in April 1983, see 48 Fed.Reg. 15,591, 15,593 (Apr. 12, 1983) (codified at 12 C.F.R. § 563b.10(c) (1984)),[35] and the first merger-conversion approved by FHLBB was completed in April 1984. See Def.'s Ex. 235 at 1. Plaintiff has not asserted that it could have acquired Cragin by another acquisition or merger device. Given these facts, we cannot conclude that it was reasonably foreseeable to FSLIC that a merger-conversion with Cragin could take place. See *Prudential Ins. Co. of America v. United States*, 801 F.2d 1295, 1301 (Fed.Cir.1986) (no evidence of knowledge on part of government of possibility of loss of additional business of the scale claimed).

Even if the court accepted plaintiff's argument that this degree of foreseeability is unnecessary, or if it found that the prospect of the Cragin merger-conversion was reasonably foreseeable by both parties in 1982, we find that plaintiff has failed to establish that it is more likely than not that the merger-conversion would have occurred absent the government's breach. In short, the independent element of causation-the necessity of establishing proof of damages with reasonable certainty-is missing. Plaintiff has not shown that the merger-conversion was likely to have occurred at the end of 1989 absent the breach.

Plaintiff relies on the testimony of Roberts and Jahns to establish the inevitability of the transaction. The sum of their evidence, however, supports only the conclusion that both were interested in the possibility of a merger-conversion in 1988 and the early part of 1989, and that neither could foresee any serious impediment to such a transaction at that early stage of discussions. But discussions had not progressed very far. It is telling that Roberts did not report the existence of any discussions with Cragin to Talman's board. Roberts testified that he generally reported the existence of ongoing discussions, albeit in veiled terms to disguise the identity of the other party. Board minutes prior to FIRREA reveal numerous veiled references by Roberts to ongoing merger talks with other thrifts, including Amity, Great Northern, and Hinsdale,[36] but there are no references to his talks with Cragin, despite the fact that such a merger would have been the largest in Talman's history.[37] Given this lack of documentary evidence, the court finds that discussions never developed beyond the earliest stage.[38]

---

**35.** The FHLBB promulgated these regulations on a "test-case basis" in May 1982. See 47 Fed.Reg. 19,672, 19,676–77 (May 7, 1982) (codified at 12 C.F.R. § 563b.10(d) (1983)). The regulations took general effect on April 11, 1983. See 48 Fed.Reg. at 15,591.

**36.** See Tr. at 418 (identifying a reference in the April 25, 1988 minutes to "ongoing" merger-conversion discussions with Amity, though noting that "nothing concrete has developed"); *id.* at 421 (identifying references in the June 27, 1988 minutes to "continuing" negotiations with Great Northern and Hinsdale).

**37.** Roberts testified that the minutes of the November 22, 1999 meeting of Talman's executive committee document the discussions with Cragin and Cragin's enthusiasm to complete the deal.

The minutes relate his merger-conversion discussions with four thrifts and note that "one, in particular, had evidenced great interest." Pl.'s Ex. 156 at 1. Roberts testified that this reference was to Cragin. See Tr. at 212–13, 445–46. The next page of that document, however, reveals that it was "a large West Coast thrift" that had expressed "a great deal of interest in combining with Talman" through a merger-conversion. Pl.'s Ex. 156 at 2. Given this clarification (which was not brought to Roberts' attention during his testimony), the "West Coast thrift" was probably the fourth merger-conversion candidate identified, not Cragin.

**38.** The court does not mean to suggest that the discussions did not take place, only that they were preliminary in nature and are not sufficient

Moreover, Roberts and Jahns had not exchanged financial data, nor had an appraisal been obtained of Cragin. Many other steps also would have been necessary to complete a merger-conversion: negotiation of a definitive agreement, due diligence, approval by the boards of both thrifts, approval by Talman's shareholders, and OTS approval. Although some of these steps may have been formalities, there is good reason to believe that Cragin's board would have been considerably less enthusiastic about a merger-conversion than Roberts. A merger-conversion would have been a very good deal for Talman—Roberts referred to the deal as a "free lunch." The free lunch would have been at Cragin's expense, however.[39] As defendant's expert Ross, testified, Cragin could have converted to a stock institution and then merged with Talman, thus enabling Cragin's depositors (and shareholders) to precipitate, before the merger, the benefits of any discounted valuation of its assets.[40] By entering into a merger-conversion with Talman, Cragin would have foregone this lucrative alternative and handed a substantial part of the value of its positive net worth to Talman and its shareholders. It would also have been required to share the burden of Talman's negative tangible capital position.

Jahns' testimony that the merger-conversion would have benefitted Cragin's shareholders, for example, by improving the liquidity of Cragin's stock, is not dispositive. These benefits could have been achieved by a merger with Talman after a stock conversion by Cragin.[41] Furthermore, Jahns had not yet reviewed Talman's financial data at that early stage of their talks and may not have appreciated how much of Talman's capital was intangible, and thus how valuable Cragin's tangible equity was to Talman.

Other obstacles to a merger-conversion existed. One was the existence of the warrants held by FSLIC, which entitled it to purchase stock equal to one quarter of the publicly-traded number of shares at any time up until December 23, 1991. These warrants, which could be exercised at a price of $11.47, effectively placed a ceiling on Talman's stock price. Roberts had not disclosed the existence of these warrants to Jahns. Moreover, Larry Fleck, OTS' assistant chief counsel for thrift conversions, testified that OTS had never approved a merger-conversion where warrants were outstanding on the acquirer's stock. This fact may have delayed or even precluded OTS approval of the deal.

Another potential obstacle was the sheer size of the transaction. As of 1989, the largest merger-conversion approved by FHLBB involved a mutual thrift valued at $53 million. Fleck testified that neither FHLBB nor its successor, OTS, have ever approved a merger-conversion involving a mutual thrift valued at or above $100 million, Roberts' estimate of Cragin's value in 1989. This evidence casts doubt on whether OTS would have approved the deal.

*Id.* at 22,730.

to show that a merger-conversion was impending. As indicated elsewhere in this opinion, the court had no concerns about Roberts' credibility.

39. In 1994, OTS prohibited merger-conversions in nonsupervisory mergers for primarily this reason. *See* 59 Fed.Reg. 22,725, 22,729–30 (May 3, 1994). The preamble to that announcement stated:

[m]erger conversions are perceived as being overly generous to the acquiring entities since they are essentially able to acquire the mutual association at no cost. Unlike other corporate acquisitions, the acquirer pays nothing for the converting association's stock.... In essence, the acquiring entity is obtaining control and receiving a "windfall" gain. As a result, there is tremendous incentive for an acquirer to offer *excessive benefits to the management* of a mutual savings association to participate in a merger conversion.

40. In 1994, in the same announcement that prohibited merger-conversions, *see supra* note 39, OTS adopted this two-step process in an effort to protect the interests of mutual account holders:

The account holders at the mutual association should be given the opportunity to purchase stock in a mutual to stock conversion. This assures the account holders that they will have the opportunity to more directly participate in any appreciation of the converting association's stock price following the conversion. After the conversion to stock form, stockholders can vote whether to merge with another institution....
59 Fed.Reg. at 22,730.

41. Indeed, Cragin ultimately pursued this two-step process. It converted to a stock institution in 1991 and was acquired by ABN AMRO in June 1994, creating LaSalle Cragin.

The court finds that a merger-conversion between Talman and Cragin was only a remote possibility when FIRREA caused the thrifts to suspend further discussions. Accordingly, we find that plaintiff has failed to show that the merger conversion is more likely than not to have occurred at year-end 1989 but for the breach. The court rejects this element of plaintiff's lost profits claim.

b. Foregone Mortgage Servicing

Roberts testified that Talman would have expanded its already considerable mortgage servicing operations in 1990 if it had been permitted to do so by OTS. At the end of 1988, Talman Home Mortgage Corporation, Talman's subsidiary that responsible for mortgage servicing, was servicing $4.86 billion, including $3.1 billion of mortgages for loans originated by financial institutions other than Talman. The business was profitable, with pre-tax earnings of $4.3 million in 1988. After December 7, 1989, Talman was prohibited from acquiring additional mortgage servicing because it held negative tangible capital. Talman's first capital plan, submitted to OTS in December 1989, requested permission to acquire an additional $500 million in servicing in 1990. That request was ultimately denied by OTS. Between 1989 and November 1991, Talman's mortgage servicing business steadily shrank as existing loans in the portfolio were paid off. In November 1991, after the merger agreement with ABN AMRO had been signed, Talman acquired $565.7 million in loans from affiliates of ABN AMRO for servicing. As of December 1991, Talman's portfolio had expanded to $3.5 billion of loans service for other banks.

Dr. Baxter estimates that Talman's lost profits from mortgage servicing were $1 million per year in 1990, 1991, and 1992, calculated using Talman's historic return on assets serviced for other investors. Defendant asserts that plaintiff has failed to present sufficient proof of these damages. We disagree. During his direct examination, Dr. Baxter described his method of calculation in detail. That proof is sufficient.

We adjust Dr. Baxter's calculation to reflect the mitigation obtained by Talman. The November 1991 addition of more than $500 million to Talman's loan servicing portfolio fully mitigated Talman's claimed damages. Plaintiff has therefore shown that it lost profits on its mortgage servicing business for the period from January 1990 to November 1991. This amounts to $1.9 million.

c. Permanent $1 Billion Shrink in Assets

Roberts testified that Talman was forced to shrink its assets by $1 billion at the end of 1991 and in the early part of 1992 in order for the bank to be able to reach capital compliance with the $300 million capital boost from ABN AMRO. He testified that this shrink was permanent because the $300 million of capital from ABN AMRO was only sufficient to enable Talman to attain compliance—it did not provide a surfeit of capital that could be used to leverage additional assets and liabilities. Dr. Baxter testified that Talman earned a one percent return on assets between 1991 and 1998. Accordingly, he calculated that Talman suffered lost profits of $10 for each year from 1992 to 1998, $70 million in total. Defendant does not contest that the shrink occurred, or that it reduced Talman's assets by $1 billion. Instead, it claims that the shrink was not permanent—Talman's assets had recovered to their pre-shrink level by the end of the first quarter of 1993—and that the return on assets figure used by Dr. Baxter is unsupported.

The evidence supports defendant's contention that the shrink was only temporary. The shrink resulted from Talman's disposition of three types of liabilities: approximately $275 million of deposits associated with the Peoria branches; the remaining $555 million in auction rate preferred stock; and short-term borrowings. This reduction in liabilities was offset by the sale of almost $700 million in mortgage-backed securities and the sale of other assets. Most of these transactions were completed in the fourth quarter of 1991; the sale of the Peoria branches, the last of these events, was completed in March 1992. Between September 1991 and March 1992, Talman's assets decreased by approximately $911 million, from

$5.83 billion to $4.92 billion. By September 1992, Talman's assets had risen back above $5 billion, and thereafter increased steadily each quarter, reaching $5.93 billion in September 1993.

Given this data, the court concludes that Talman had fully recovered from the shrink in assets by September 1993, two years after the shrink began. Moreover, for the majority of this period, the shrink was considerably less than $1 billion. Using data available in the record for each quarter in this period, the average shrink during the two-year shrink period was $550 million.

The parties spent a great deal of time at trial presenting evidence regarding the appropriate return on assets to be used in calculating the lost profits from the shrink. Dr. Baxter estimated a one percent return on assets, derived from two sources: Talman's actual 0.8% return on assets in 1986–89; and the return obtained from Talman's finance subsidiaries in the 1986–91 period.[42] Ross, defendant's expert, testified that the former is not representative because it relates to the period prior to the shrink, and the latter, properly calculated, shows that Talman would have had a negative return on any additional assets (i.e., assets that it would have retained had it not been forced to shrink).

The court agrees with Ross' reservations about the use of data from prior years, especially as data for these years is in the record and 1992 was one of the least profitable years in Talman's recent history. We disagree, however, with his conclusion that Talman's return on additional assets would have been negative during that period. Ross testified that, when the true costs of operating the finance subsidiaries are considered, the subsidiaries provided a return on assets of less than 1%. Consequently, if Talman had not shrunk and instead financed these assets with higher-cost borrowed funds, Talman would have incurred a negative return on

assets, i.e., it would have lost money on these additional assets. In other words, according to Ross, the shrink *saved* Talman from experiencing losses.

We disagree that the finance subsidiaries provided Talman with such a meager return on assets. This is inconsistent with Roberts' testimony that the subsidiaries provided a low-cost source of funds, and hence were a profitable stratagem for Talman. It is also at odds with Talman's election to use this source of financing over a period of years during which Talman enjoyed substantial profitability. If Ross' calculation were correct, Talman's election to set up and maintain these finance subsidiaries would have been foolhardy because it generated a lower return on assets than Talman's direct operations. Given the choice between the testimony of Roberts, rated by government regulators as one of the best managers of assets and liabilities in the industry, and Ross, who has no practical experience in this field and who was not qualified as an expert in the area of thrift operations, we choose the former.

Accordingly, we reject Ross' assertion that Talman would not have earned a profit on additional assets. Talman's annual reports show that it was profitable throughout the shrink period.[43] OTS' May 1992 examination report of Talman states that Talman had a 0.59% return on assets in 1991, and a similar return of 0.58% in the first quarter of 1992 (after removing extraordinary items). This data would appear to be more reliable than the figures derived by either expert. The court will therefore use a figure of 0.6%. Multiplying this figure by the average shrink of $550 million yields an annual lost profit of $3.3 million. For the two-year shrink period, Talman thus lost $6.6 million.

#### d. Wounded Bank Damages

■ Dr. Baxter adjusts the "But–For" Bank earnings by adding in $13.5 million in

---

**42.** Dr. Baxter estimated that Talman earned a 2% return on its finance subsidiaries. Using a statement from Talman's 1990 business plan that the earnings of the subsidiaries were approximately 1% greater than the overall bank, he derived a return on assets of 1%.

**43.** The data for 1992 are somewhat murky because of the ABN AMRO acquisition. Talman earned $2.3 million in the first quarter, but lost $.14 million in the last ten months of the year after the February 28, 1992 merger.

expenditures allegedly incurred due to the breach during the period after FIRREA when Talman operated at the forbearance of OTS, referring to them as "wounded bank damages." Dr. Baxter's calculus of wounded bank damages includes eight items: (1) investment banking fees; (2) accounting fees; (3) legal fees; (4) OTS assessment penalties; (5) collateral delivery charges; (6) excess director and officer ("D & O") liability insurance and bond costs; (7) Talman's officers' time; and (8) excess preferred stock expense. Dr. Baxter includes wounded bank damages as an adjustment to the But–For Bank's earnings for the following reason: these costs were actually expended by Talman and, consequently, have diminished its actual earnings; these costs would not have been incurred by the But–For Bank; therefore, wounded bank damages must be added to Talman's actual earnings to arrive at the earnings of the But–For Bank. In principle the court agrees.[44]

Defendant does not challenge four of these direct costs: investment banking fees, accounting fees, OTS assessment penalties, and collateral delivery charges. Plaintiff has presented adequate evidence to quantify its claim on these elements. Accordingly, plaintiff has proven that it incurred $1,380,000 in investment banking fees, $130,000 in accounting fees, $579,000 in OTS assessment penalties, and $39,700 in collateral delivery charges. The remaining elements of wounded bank damages are disputed by defendant.

#### i. Legal Fees

Plaintiff claims $2,530,000 in legal fees incurred in lobbying and in Talman's recapitalization efforts. Defendant asserts that attorney fees are not allowed in suits against the United States absent an express statutory provision, which is lacking here. The case cited by defendant, *Piggly Wiggly Corp. v. United States,* 112 Ct.Cl. 391, 81 F.Supp. 819 (1949), however, prevents recovery of fees incurred only in litigating a claim against the government, *see* 81 F.Supp. at 829, which plaintiff is not seeking here. The rule does not preclude plaintiff from claiming legal fees incurred in its effort to recapitalize, which was triggered by FIRREA and required by OTS. Plaintiff can claim attorneys fees.

#### ii D & O Liability Insurance and Bond Costs

Plaintiff seeks $350,000 in increased D & O liability insurance and surety bond costs that it experienced in 1990 and 1991. It attributes the entirety of this increased cost to the repercussions of FIRREA. Robert Jones, Talman's Chief Financial Officer at the time of FIRREA, testified that after FIRREA, the bonding and insurance companies raised premiums, demanded more extensive disclosure, and increased Talman's deductible contributions. Defendant argues that factors other than FIRREA may have caused these higher premiums, but offers no examples. There is sufficient evidence to establish that FIRREA was at least a substantial factor in plaintiff's increased costs. We find that plaintiff has demonstrated that it incurred increased premiums of $350,000 due to FIRREA.

#### iii. Officers' Time

 Plaintiff seeks $2.8 million in compensation for the time spent by six of its key officers in 1990–92 in their efforts to comply with OTS regulations implementing FIRREA, including preparation of capital plans and efforts to raise capital. It is clear, however, as defendant argues, that Talman did not incur any additional *direct* costs for officers' time due to the government's breach. Accordingly, Talman's actual earnings were

---

**44.** They are presumptively not recoverable as incidental damages under plaintiff's lost profits approach because, as noted above, they have been factored into the calculation of lost profits. If, despite their impact, the But–For Bank still was more profitable than the actual bank, the court ordinarily would have no reason to treat them as an independent and supplemental item of damage. Doing so would allow double recovery for the allowable wounded bank damages. In this particular case, however, because we hold that plaintiff is not entitled to lost profits per se, there is no possibility of double recovery. Plaintiff, therefore, is entitled to recover these wounded bank damages as incidental damages. *See United States v. Behan,* 110 U.S. at 345, 4 S.Ct. 81. *Restatement (Second) of Contracts* § 347(b) & cmt. c. (allowing recovery of any incidental losses caused by the breach and noting that such losses include "costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction").

not impacted by the amount claimed, and thus there is no need to make an adjustment to actual earnings for this item to arrive at the earnings of the But–For Bank.

### iv. Excess Preferred Stock Expenses

■ At $5.66 million, this is the largest element of plaintiff's incidental damages. Plaintiff claims that, as a result of FIRREA and the delay in approval of its capital plan, investors lost confidence in the creditworthiness of Talman's finance subsidiaries and the auction rates on the preferred stock issued by these subsidiaries rose accordingly. These higher rates equate to increased financing costs that were experienced from 1989 to 1991.

Some factual background is necessary for this issue. Beginning in 1986, Talman established nine finance subsidiaries as an alternative, low-cost source of funds. These subsidiaries were collateralized by assets pledged by Talman. Because the subsidiaries were considered to be "bankruptcy proof," they received AAA credit ratings and thus provided a lower cost of funding than Talman could achieve by issuing preferred stock directly— Dr. Baxter testified that prior to FIRREA, the historical average auction rate was 79.7% of the rate on AA-rated commercial paper. Seven of these subsidiaries issued preferred stock whose rate was reset by an auction process every forty-nine days. Each issued between $75 and $95 million in preferred stock. After August 1987, when the last of these subsidiaries was established, Talman had approximately $700 million of preferred stock outstanding at any time. At the end of 1991, after Talman had agreed to merge with ABN AMRO, all of this preferred stock was redeemed, the assets unwound, and the subsidiaries dissolved.

Dr. Baxter testified that the ratios of the rates of Talman's preferred stock relative to commercial paper were generally higher than 79.7% after FIRREA. The record shows that the ratio was greater than 79.7% for all but two of the twenty-seven months that Talman had preferred stock outstanding after August 1989. Dr. Baxter calculated the excess dividend payments based upon the excess interest rates during this period, including offsets for those quarters in which the ratio fell below the historical average.

Defendant argues that plaintiff has failed to establish that the excess rates paid by Talman for preferred stock after FIRREA were caused by defendant's breach. It submitted data showing that the preferred stock dividend rates of all companies cumulatively, and of five industry groups (insurance companies, industrial companies, utilities, finance companies, and banks) separately, increased relative to commercial paper rates during this same period. Ross testified that this rise can be explained by the economic recession that occurred in 1990 and 1991. He explained that the tax advantages of preferred stock over commercial paper to corporate investors were diminished during that period because corporations were experiencing losses in their operations that provided alternative tax shelters to preferred stock. Preferred stock thus became relatively less attractive than commercial paper.

The court finds Ross' explanation persuasive. Although the increase in Talman's relative dividend rates over the course of this period was marginally more dramatic than that of all firms generally, or the three of the industry groups, and substantially more severe than the increase in rates experienced by insurance companies, it was less rapid than that of the industrial companies. It appears, therefore, that relative dividend rates were rising for reasons unrelated to FIRREA. Moreover, there is no evidence that the greater impact on relative rates experienced by plaintiff than by all firms is statistically significant. Accordingly, we hold that the increased relative borrowing costs experienced by Talman from preferred stock after FIRREA were more probably than not caused by factors general to the economy, not the defendant's breach. In any event, plaintiff has not shown that the government's breach caused any portion of its higher rates. Plaintiff is not entitled to recover this element of damages.

In sum, Talman has demonstrated that $5,008,700 of its expenses between 1989 and 1991 were "wounded bank damages."

### e. Other Adjustments to the But–For Bank's Earnings

In light of the adjustments to Dr. Baxter's model discussed above, three further subtractions from actual earnings must be made to arrive at the correct calculus of the But–For Bank's earnings (which can then be used in the calculation of lost profits). Because they reduce the But–For Bank's earnings, all three adjustments reduce plaintiff's lost profits.

The first concerns Cragin's earnings. Dr. Baxter did not subtract Cragin's earnings in 1995–98 from actual earnings because he assumed that, in the but-for world, Talman would have merged with Cragin in 1989. Under this assumption, all of Cragin's subsequent earnings should be included in the But–For Bank's earnings. Having determined *supra* that the merger-conversion with Cragin more probably than not would not have occurred, Cragin's 1995–98 earnings must be backed out of the calculus, unless plaintiff has proven that Talman or LaSalle Talman would have acquired Cragin at some later date. It has not. In fact, Dr. Baxter testified that the But–For Bank would not have had sufficient capital to have acquired Cragin in 1994 or 1995.

Dr. Baxter did address an alternative method by which Cragin "would have been acquired by the But–For Bank." He testified that if the merger-conversion had not occurred in 1989, the But–For Bank would have acquired Cragin in the year after it converted to a stock institution (in June 1991), prior to the large increase in Cragin's stock price by June 1994.[45] Dr. Baxter presented no analysis to support his statement. This testimony does not establish that it is more probable than not that the But–For Bank would have acquired Cragin in 1992. Consequently, Cragin's 1995–98 earnings must be subtracted from the earnings of the But–For Bank to recognize the likelihood that the bank would not have merged with Cragin absent the breach.

The second adjustment concerns the branches acquired from Home Savings. Dr. Baxter presented his analysis showing that the But–For Bank could have acquired the Home Savings branches using the capital raised by the hypothetical merger-conversion with Cragin in 1989. He also testified that the Home Savings acquisition may have been feasible if the But–For Bank had instead acquired Cragin in 1992 under his alternative theory. Dr. Baxter conceded, however, that the But–For Bank could not have acquired the Home Savings branches without the benefit of Cragin's capital. Because we have concluded that plaintiff has failed to show that either the merger-conversion or the alternative 1992 acquisition probably would have occurred, we can only conclude that plaintiff has failed to establish that the But–For Bank would have acquired the Home Savings branches. Accordingly, we must subtract the earnings attributable to these branches from the earnings of the But–For Bank after November 1994.

The final adjustment is to account for the acquisition of Bell Savings. Dr. Baxter determined that the But–For Bank would not have acquired the Bell Savings branches because it would not have had sufficient capital. Nevertheless, he did not subtract the earnings attributable to the Bell Savings branches acquired in 1997 because he determined that these earnings should be deducted from the earnings of both Old Talman and the But–For Bank. The net result is a wash. Accordingly, he made no adjustment to the But–For Bank's earnings for Bell Savings, and no evidence was presented at trial as to the quantum of these earnings.

The court accepts Dr. Baxter's assessment that the But–For Bank could not have acquired Bell Savings and thus the earnings from these branches must be subtracted from the But–For Bank's earnings in 1998. Because the court has concluded that this deduction was improper in the case of Old Talman, *see supra* § III.C.1, the net result is not a wash. Therefore, the subtraction from but-for earnings must be made in order to reach a proper measure of lost profits.

Reconciling all of these adjustments to Dr. Baxter's calculation of the earnings of the But–For Bank yields the following:

---

45. ABN AMRO purchased all of Cragin's outstanding stock at $38 per share in June 1994. The offering price for Cragin's shares in June 1991 was $9.

Earnings of the
But–For Bank = Actual earnings

| | | |
|---|---|---|
| + Wounded bank damages | $ 5.0 million | |
| + Mortgage servicing | $ 1.9 million | |
| + $1 billion shrink lost profits | $ 6.6 million | |
| − Home Savings' earnings (1994–98) | ($ 67.2 million) | |
| − Cragin's earnings (1995–98) | ($233.5 million) | |
| − Earnings on $300 million cash | ($116.2 million) | |
| Subtotal of adjustments to earnings = | ($403.4 million) | |

Total adjustments = ($403.4) million *minus* the Bell Savings' earnings

The But–For Bank, in short, would have made less money, by a substantial amount, than plaintiff ultimately made.

### 3. Liability Replacement Addendum to Lost Profits

Plaintiff also claims $58.9 million in "reduced interest expense." This represents the money allegedly lost due to an inability to pay down borrowings or deposits because the lost profits were not available for that purpose. This claim obviously presupposes that there were lost profits and that, if there had been, they would have been used for that purpose. If the court's analysis above is correct, however, there were no lost profits and hence no lost opportunity to save on interest expense. The claim thus fails for that reason alone. In addition, reduced interest expense is a negative expression of a positive claim: the lost opportunity costs of money, i.e., interest. Pre-judgment interest would not be available as a matter of law in this court, there being no statutory or contractual basis for it, nor should the same damages be recoverable in a different guise.

### D. Offset of Benefits Attributable to the ABN AMRO Acquisition

Defendant's final argument is that any lost profits substantiated by plaintiff must be offset by the benefits that it and its shareholders received from the acquisition by ABN AMRO. Defendant contends that, absent the breach, the ABN AMRO acquisition would not have taken place and, moreover, the acquisition provided a substantial windfall to LaSalle Talman. It identifies two benefits that flowed from the acquisition that must be subtracted from plaintiff's lost profits: the

substantial premium paid to Talman's shareholders by ABN AMRO to acquire Talman's stock; and the interest that LaSalle Talman earned on the $300 million cash infusion provided by ABN AMRO. Plaintiff concedes that Talman would not have been acquired by ABN AMRO absent the breach [46] but argues that the benefits identified are either irrelevant to this suit or have been accounted for in Dr. Baxter's model.

The court agrees with defendant that the benefits of mitigation must be accounted for by inclusion of all actual income in the "Old Talman" subtrahend of the lost profits calculus. *See supra* § III.C.1. The ABN AMRO acquisition was dependent upon the government's breach. The subsequent acquisitions, which were made possible by subsequent cash infusions by ABN AMRO, thus also flow from the breach. Nevertheless, the court disagrees with the two specific items defendant identifies.

The answer to defendant's first contention is that the bank is a separate entity and the sole plaintiff here. Any premium over the market value of stock received by former Talman shareholders is therefore irrelevant to the claim of the bank. Defendant has not identified any direct benefit that the bank itself, as opposed to its shareholders, received from this premium.

The second benefit identified by defendant—the benefit that plaintiff received by having $300 million of real capital, rather than $514 million in supervisory goodwill—has already been factored into Dr. Baxter's model, as a subtraction from the earnings of the But–For Bank. Dr. Baxter's calculation also takes into account the interest-earning potential of two additional cash payments made by ABN AMRO to plaintiff in 1994 and 1997 to facilitate the acquisitions of Home Savings and Bell Savings, and adjusts for dividend payments made by plaintiff and the But–For Bank. The net result is a figure of $116.2 million. Defendant did not contest this calculation and we have used it above in

---

**46.** Plaintiff argued, on the basis of Mr. Roberts' testimony, that the acquisition would not have occurred absent the breach because Talman's management had a strong desire to maintain the bank as an independent institution.

our modified calculation of the But–For Bank's earnings.

### E. Corrected Past Lost Profits Calculus

Plaintiff would be entitled to its lost profits as measured by the excess, if any, of its projected earnings absent the breach (represented here by the earnings of the But–For Bank, as adjusted) over plaintiff's actual earnings. Using the modified But–For Bank earnings determined above, the net result is that plaintiff's past lost profits are *negative* $403.4 million, *less* the 1998 earnings attributable to the branches acquired from Bell Savings. In other words, negative lost profits up to the present exceed $403.4 million. Accordingly, plaintiff is not entitled to any award of past lost profits.

### F. Future Damages Under Dr. Baxter's Model

Plaintiff's lost profits claim includes $198.4 million in future damages, derived from the cost of replacing $306.1 million in supervisory goodwill that would have remained as of December 31, 1998 with real capital. Plaintiff calculates these damages using a similar methodology to the one employed in its cost of replacement capital approach discussed below. Professor James' calculation assumes that plaintiff would issue $306.1 million in preferred stock at a dividend rate of 10%, pay initial transaction costs of $10.7 million, and retire $23.1 million of the stock each year. After accounting for income taxes (at a 40% rate) and offsetting the benefit of real capital, the future annual "net costs" of preferred stock are discounted to present value using a 5% discount rate, approximately the present rate on one-year Treasury notes.

Contrary to defendant's assertion, the elimination of Talman's supervisory goodwill in the 1992 acquisition does not *per se* preclude use of Professor James' model to estimate future expectancy damages. Absent the breach, Talman would not have been acquired by ABN AMRO and thus would have retained its supervisory goodwill. Plaintiff thus may attempt to show future lost profits to the extent that it would have realized greater profits absent the breach than it actually did following the cash infusions by ABN AMRO.

Nevertheless, we hold that plaintiff cannot recover future lost profits for a simpler reason: it has not proven any past lost profits. Dr. Baxter adopted Professor James' future damages model as an alternative to a direct estimate of future lost profits based upon LaSalle's projected earnings. In effect, Dr. Baxter assumed that plaintiff would incur future lost profits because, according to his calculation, it suffered past lost profits. The court has found that to be an incorrect assumption. The bank is thus not entitled to future lost profits.

### G. Conclusion

In sum, plaintiff is not entitled to any lost profits damages, past or future. Three observations need to be made, however, as to why plaintiff is not entitled to any lost profits damages here. First, the result is not prompted by the fact that the bank's earnings expanded. Actual earnings, no matter how high, serve only as a baseline for comparison with the earnings of the But–For Bank. The bank simply failed to establish that it would have earned more than it actually did absent the breach.

Second, the zero damages outcome of this lost profits analysis is, in large part, a result of the extraordinary mitigation obtained by plaintiff in this case, and the events occurring after 1994. In particular, it is dependent to a great extent on the significant cash infusion made by ABN AMRO in 1994 and 1997 to fund the acquisitions of Home Savings and Bell Savings respectively, and the $489 million paid out by ABN AMRO to acquire Cragin, which was merged into LaSalle Talman in 1995. These three events swelled plaintiff's actual earnings dramatically—Cragin's earnings after 1995 alone boosted LaSalle's earnings by $233.5 million. Of equal importance, the But–For Bank could not have made any of these acquisitions. As a result, earnings flowing from these three events subtract from any positive lost profits elements demonstrated by plaintiff, in this case, only the earnings lost on the $1 billion shrinkage and the loss of mortgage servicing

(both of which occurred in the 1990–92 period).

The timing of these events is critical to the success of plaintiff's claim. Plaintiff cannot recover lost profits today because the mitigation it obtained in 1992—the acquisition by ABN AMRO—has enabled it to achieve in recent years substantial earnings that the But–For Bank could not have achieved. In other words, today, plaintiff is better off than it would have been absent the breach. That same statement may not have been possible prior to November 1994.

Third, we note also that plaintiff has not alleged that it suffered lost profits from any foregone ability to take on new deposits at existing branches, or foregone opportunities to open new branches. Nor has it alleged that it would have acquired any thrifts other than Cragin and Home Savings. Its lost profits, therefore, hinge upon its allegation that a merger-conversion with Cragin would have occurred in 1989. Once that keystone is removed, its entire lost profits claim fails.

## IV. Cost of Replacement Capital

Under this damages theory, plaintiff seeks to recover the cost it would have incurred to raise capital by issuing preferred stock in 1989 to replace the outstanding supervisory goodwill that remained on its books at the time of the breach. Professor James' "preferred stock model" yields a damages figure of $1,196.6 million, derived from the cost of issuing $431.1 million [47] of preferred stock at a dividend rate of 20%, which is at the low end of the range of rates paid by other savings and loans on preferred stock that year. Under this model, annual dividend payments are calculated based upon the 20% dividend rate and the balance of unamortized supervisory goodwill remaining each year.[48] Each dividend payment is then inflated to recognize that dividends are not tax deductible, and finally offset by earnings on the capital raised by the issuance (calculated at 7% per annum, the average cost of Talman's liabilities at that time). Professor James then discounts future (post–1998) figures by a discount rate of 5% to reduce them to present value.

At the outset of the trial, defendant's senior counsel stated that the cost of replacement capital is the correct methodology for calculating a plaintiff's damages in *Winstar* cases.[49] *See* Tr. at 239. Nevertheless, the parties' views regarding how these damages should be calculated under this theory differ substantially. Plaintiff asserts that the appropriate figure is $1,196.6 million; defen-

47. As of December 31, 1989, Talman had $514.0 million of unamortized supervisory goodwill. FIRREA recognized a portion of this goodwill as "qualifying supervisory goodwill," which could be counted toward the 3% core capital requirement through 1994. The amount of qualifying supervisory goodwill declined from 1.5% of assets in 1990 and 1991, to 0.375% in 1994. *See* 12 U.S.C. § 1464(t)(3)(A). In March 1990, OTS informed Talman that it needed to achieve fully phased-in compliance by December 31, 1993.

Although FIRREA did not permit any of Talman's supervisory goodwill to be counted towards the *tangible* capital requirement, Professor James, to be conservative, adjusted the amount of supervisory goodwill to be replaced during this transition period to account for this qualifying supervisory goodwill. For example, Talman had approximately $83 million of qualifying supervisory goodwill at the end of 1989. After adjustment, Professor James calculated that Talman needed to replace only $431.1 million ($514.0 million less the qualifying supervisory goodwill) at the beginning of 1990 by issuing preferred stock. The amounts for other years during the transition period were adjusted accordingly.

48. Professor James assumes that Talman would retire $23.1 million of preferred stock each year to mimic the amortization schedule for supervisory goodwill. The amortization schedule established by the 1986 contract required Talman to amortize goodwill at an annual rate of $24.0 million. *See* Pl.'s Ex. 87 at 27. But this amortization schedule includes amortization of some nonsupervisory goodwill arising from Talman's acquisition of Melrose Savings in 1981. *See id.* Professor James' figure of $23.1 million represents the portion of amortization attributable solely to supervisory goodwill. Defendant did not challenge this figure and the court accepts it as accurate.

49. Initially, counsel stated that the government's position was that either restitution or lost profits were valid approaches to calculating damages in this case, but cost of replacement capital was not. *See* Tr. at 67. The next day, however, counsel stated that cost of replacement capital is the correct method of calculating damages in *Winstar* cases.

dant contends that plaintiff is entitled to only transaction costs of $16.7 million that would have been necessary to raise the replacement capital.

We agree with both parties that the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill. Although supervisory goodwill is *sui generis*, it is logical to measure damages by quantifying the cost of replacing supervisory goodwill with real capital, provided that adjustments are made to account for the differences between these two forms of capital. It is a particularly relevant approach in this case because Talman was forced by OTS to raise capital following the breach as a condition of approval of its capital plan. More importantly, Talman actually did mitigate its damages by raising the necessary capital, by negotiating a cash infusion from ABN AMRO.

It is well-settled that damages are not recoverable to the extent that they could have been reasonably avoided. *See Restatement (Second) of Contracts* § 350(1). Consequently, defendant is only liable for costs incurred by the plaintiff in reasonable mitigation. One of the difficulties the court has with plaintiff's offered "cost of replacement capital" model is that it is purely hypothetical. Here, although Talman considered various options for raising capital, including the floatation of preferred stock, it actually chose to seek capital from a merger partner.[50] The effort to replace capital thus did not occur in the way that Professor James' hypothetical model is set up.

The reason Talman did not issue preferred stock in 1989 is also pertinent. It did not do so for the simple reason that it could not have paid the high dividend rates out of its projected future earnings. In short, that form of mitigation was unrealistic at that time. Instead, in June 1991, when Talman was given an ultimatum to raise capital by the end of the year, it chose not to replace supervisory goodwill by issuing new capital; instead, it negotiated for a cash infusion by ABN AMRO upon completion of the merger.

If this suit had been commenced and tried earlier—i.e., before the ABN AMRO acquisition with all its subsequent benefits—then resort to a hypothetical model might make sense. But even then, defendant would only be liable for reasonable mitigation. Going out of business may have cost less than locking in an obligation to pay unrealistically high returns on preferred stock. But it is particularly inappropriate to resort to a hypothetical and unreasonably expensive method of replacing capital when the record shows the actual method of mitigation chosen by Talman. Accordingly, plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit, that is, obtaining the $300 million cash infusion from ABN AMRO in 1992. In sum, although the court will address the particulars of defendant's critique of Professor James' calculation, its most fundamental flaw is that it represents an unreasonable mitigation and thus is an unnecessary exercise in view of Talman's actual experience with mitigation.

Defendant raises numerous objections to the quantum of plaintiff's recovery under this cost of replacement capital theory. First, it argues that Professor James' model is fundamentally flawed because the upper limit of damages is only $16.7 million, the transaction costs of issuing preferred stock. Second, defendant asserts that, even if Professor James' model is correct, he erred by (1) failing to properly discount the stream of dividend payments, and (2) adjusting the annual dividend payments upwards to generate pre-tax costs.[51] Third, defendant argues that the cost of replacement capital theory only serves as a limitation on damages, not as an

---

50. The facts here are thus different from the events in *Glendale* and *California Federal II*, where the plaintiffs each raised capital after FIRREA by floating stock. *See Glendale*, 43 Fed.Cl. at 394, 401, *California Federal II*, 43 Fed.Cl. at 460.

51. Defendant does not challenge the dividend rate of 20% utilized by Professor James, or the 7% rate that he used to calculate the offsetting benefit of cash.

independent theory of recovery. Fourth, it argues that plaintiff's damages must be capped by Talman's market value in August 1989. Finally, the government asserts that the proper measure of damages under this theory is the actual cost of replacing capital experienced by plaintiff, i.e., the cost of raising the $300 million cash infusion from ABN AMRO. Although the court agrees with some of these arguments, and although it ultimately rejects the claim for other reasons, it has sufficient misgivings about defendant's primary argument that an extended discussion follows.

### A. Defendant's Zero Net Present Value Theory

Defendant's principal objection to Professor James' model is that the cost of replacement capital is zero, with the exception of transaction costs. According to defendant, plaintiff's recovery should thus be limited to $16.7 million, the estimated costs of floating the hypothetical preferred stock. This theory was presented in the expert report of David Ross and Professor Miller, and through Professor Miller's trial testimony.

Defendant's argument rests on one of the fundamental principles of corporate finance: the net present value ("NPV") of any financing decision, including the decision to raise capital by issuing preferred stock, is generally zero. In the context of a preferred stock issue, the present value of the capital raised by the transaction is equal to the present value of the stream of dividends that the issuer is obligated to pay to the stockholders. Defendant contends that if plaintiff had issued $431.1 million in preferred stock in 1989 with a dividend rate of 20%, the then present value of the stream of future dividend payments over the next twenty-three years was

also $431.1 million. Because these amounts offset each other exactly, plaintiff's net cost would have been only the expenses incurred in floating the preferred stock—investment banking fees, attorney fees, etc. Defendant accepts plaintiff's estimate of $16.7 million for these costs.

Professor Miller's testimony dwelt at length on the zero net present value principle. He noted that this present value is independent of the dividend rate on the preferred stock[52] and equals the cash raised by the issuance—$431.1 million. Consequently, according to Professor Miller, the only costs of preferred stock are transaction costs.[53]

The net present value principle relied upon by Professor Miller is widely-accepted in corporate finance treatises, see, e.g., Richard A. Brealey & Stewart Myers, *Principles of Corporate Finance 323* (5th ed. 1996) ("[I]t is difficult to find financing schemes with NPVs significantly different from zero."), and was not challenged by plaintiff. We will also assume that the preferred stock transaction at issue here would have yielded a zero net present value. Defendant's argument nevertheless fails because net present value analysis is not relevant to our task of calculating damages.

Defendant's argument relies on two implicit, though critical, assumptions. First, it assumes the equivalence of the present value of a stream of dividends in 1989 and the *cost* of making those dividend payments from 1989 until the final batch of preferred stock would be retired in 2012. Second, it assumes that if the net present value of a preferred stock issuance is zero, the cost of capital is also zero (with the exception of floatation costs). Neither of these assumptions was substantiated.

---

52. This somewhat counterintuitive result arises because each dividend payment is discounted back to the date of issuance (in this case, 1989) using the rate of return on other securities of equivalent risk. Because Professor Miller accepted that the 20% dividend rate chosen by Professor James was equivalent to the market rate in 1989 for preferred stock of equivalent risk, the dividend rate also operates as the discount rate. The net result is that the present value of the dividend stream is unaffected by the dividend rate.

53. Most of Professor Miller's testimony was couched in terms of the present value of dividend payments, not their cost to plaintiff. When addressing cost, he referred to the cost of raising capital. The court presumes that his conclusions factored in the cost to plaintiff of making future dividend payments, not just the immediate costs associated with a floatation. If not, his testimony would be irrelevant to our resolution of this issue.

The first difficulty the court has with Professor Miller's analysis is that he assumes the equivalence of present value and cost. He provided no explanation as to why these concepts should be equated, and the court has found none in its review of the corporate finance treatises relied on by the parties. They arise in quite different contexts and measure an economic event (in this case, a stream of dividend payments) from distinctly different perspectives.

Net present value analysis is a widely-used tool for assessing the viability of investment and financing proposals. *See id.* at 12–14, 322–23. If a company is contemplating issuing a security, net present value analysis provides a means of determining whether it should undertake the floatation: if it yields a zero or positive NPV for the company, it is worth pursuing; if it yields a negative NPV, it should be avoided. *See id.* The analysis is purely forward-looking and value-oriented. It does not seek to measure the costs involved in a transaction, or to calculate the sum of the payments that an issuer would be obligated to pay to investors under the proposed financing scheme. In other words, it has no value as a tool for calculating damages for breach of contract.

The distinction between present value and cost is significant. Present value is calculated by discounting future payments for two factors: "the time value of money" and "the riskiness of future cash flows." *See id.* at 226. In the present case, the dividend rate on the preferred stock would provide the discount rate to adjust future dividend payments to present value.[54] Applied to the stream of dividend payments, it dramatically shrinks the payments to present value. With a 20% dividend rate, the sum of dividend payments paid out by Talman would have surpassed the $431.1 million capital raised by early 1995; over the course of twenty-three years, the sum of dividend payments would have exceeded $1.1 billion.[55] The present value, however, of the dividend stream in 1989 was only $431.1 million, if one accepts defendant's analysis.

But defendant has cited no authority—from either finance or legal treatises, or case law—to support its theory that present value necessarily equates to cost. Instead, the cost to plaintiff of an obligation to make dividend payments is simply the amount of those payments, if paid, and a discounted fraction of future payments that plaintiff has an obligation to make.[56] Thus, payments shown to have been made prior to trial should be accorded full weight; future payments should be discounted to adjust for the time value of money (i.e., adjusted by the rate on Treasury securities).[57] *See Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 634 F.2d 557, 564 (1980) ("*Northern Helex III*"); *see also infra* § IV.B.1.

Our rejection of the use of present values to measure cost is consistent with both finance treatises and common sense. Under defendant's theory, the cost of capital raised by issuing preferred stock is independent of the dividend rate. Corporate finance treatises tell us, however, that the cost of preferred stock is measured by its yield, which is the stated annual dividend divided by the price of the preferred stock. *See* James Van Horne & John M. Wachowicz, Jr., *Fundamentals of Financial Management* 389 (10th ed.1998).[58]

---

54. This is simply the flip-side of the observation that investors demanded a 20% dividend rate in 1989 to compensate them for anticipated inflation and the perceived risk of non-payment of dividends by Talman.

55. This figure derives from column five of Exhibit D to Professor James' expert report, which sets out the annual dividend payments from 1990 through 2012. The sum of these figures is $1,105.6 million.

56. *But see* note 65 *infra.*

57. Defendant has presented no credible justification for discounting dividend payments based upon the risk of default perceived by investors in 1989. Admittedly, risk of default is a relevant consideration for any investor contemplating investing in a company's preferred stock. But investors' perception of the risk of securities to be issued by Talman ten years ago bears no relation upon the *actual* payments that it would make to stockholders, and thus no relation to our assessment of damages. Future payments should be discounted to account for the time value of money, but no other discounting would be appropriate.

58. The government submitted the pertinent chapter of this treatise into evidence as an authoritative statement of the cost of preferred stock. *See* Def.'s Ex. 302; Tr. at 1436.

This definition differs slightly from the method of calculating cost referred to above, but this difference arises primarily because cost of capital is measured on a percentage basis in finance, whereas we deal in dollar figures. The important point, however, is that the cost of capital increases *in correlation* with the dividend rate that a company has to offer to attract investors; the two are not independent.

If cost of capital is unrelated to the dividend rate, thrifts would not be concerned about dividend rates when issuing securities. But the testimony of Roberts and Schapiro was directly to the contrary—the dividend rate demanded by investors in 1989 was too high. We find that testimony credible: at a 20% dividend rate, annual dividend payments would have exceeded Talman's annual earnings. Moreover, if taking on an obligation to make dividend payments incurs no cost to the issuer of preferred stock (other than minimal transaction costs), savings and loan institutions would never fall out of capital compliance—they would simply issue more preferred (or common) stock as the need arose, regardless of the dividend rate demanded by investors. The testimony of Roberts and Schapiro, however, revealed that the dividend rates demanded by investors (and hence the cost of capital to Talman) were too high in 1989 for the thrift to issue preferred stock and still operate profitably. We conclude that capital raised through issuance of preferred stock can have a cost beyond floatation expenses.

The only evidence offered by defendant that supports its theory—the testimony of Professor Miller—was not persuasive. He conceded that an obligation to pay dividends would diminish the future earnings (presumably only retained earnings) of a company. *See* Tr. at 2132. It follows that a higher dividend rate would cause a greater impact on retained earnings. When asked by the court why Talman would not have incurred greater costs than a company that issued preferred stock with a lower dividend rate of, say, 10%, he was unable to provide any satisfactory response.[59] Yet, Talman would undoubtedly incur a greater impact on earnings because annual dividend payments would be higher.[60] The two companies would thus incur disparate costs, precisely because the cost of capital is correlated with the dividend rate.[61]

The second assumption critical to Professor Miller's theory is that, with the exception of transaction costs, the cost of capital is zero because the net present value of a preferred stock issuance is zero. Put another way, the value of Talman's existing equity would have been unaffected by the floatation. We have no argument with Professor Miller's testimony regarding the net present value of a stock issuance, or the potential impact on Talman's share price. The court does have reservations regarding the incompatibility of financial present value analysis with this court's duty to calculate damages, as discussed above. But even if we set those reservations aside, the court cannot accept that the *net* present value is the relevant benchmark.

During plaintiff's rebuttal case, Professor James testified that Professor Miller's focus on net present value is unacceptable because it reduces plaintiff's damages by the amount of capital to be raised in the floatation. The court agrees. Rather than taking simply the present value of the dividend payments (which he asserts was $431.1 million in 1989)

---

**59.** Professor Miller's answer noted that future dividend payments "will affect the accounting earnings, but I insist that finance and economics always run things from the standpoint of the shareholders." Tr. at 2132. His focus on the shareholder's perspective explains, in part, why the court did not find his testimony convincing.

**60.** Presumably these payments would not impact plaintiff's earnings because dividends are paid out after determination of net income. The dividend payments would, however, reduce its retained earnings dollar for dollar, and thus negatively impact its ability to augment its equity.

**61.** At closing argument, defendant's counsel admitted that Professor Miller's theory—that the only costs are transaction costs—"does sound counterintuitive," Tr. at 2620, but argued that it was in accord with fundamental principles of finance. Defendant has not provided any citation to an authority that would support its theory. Instead, one of the texts its cites contradicts its theory. *See* Van Horne & Wachowicz, *supra* note 58, at 389 (stating that the cost of preferred stock is measured by its dividend yield).

as the measure of the cost of replacement, Professor Miller's theory offsets this amount by the identical amount of capital raised. By so doing, he pre-ordains the outcome of the analysis because his approach can only yield a zero outcome. In effect, his theory is that the cost of capital is zero because any costs expended (as measured by present value) generate capital of an equal amount. This theory makes no sense in the context of a damages calculus. In simplest terms, before the breach, plaintiff had an asset—supervisory goodwill. After the breach, the asset is gone. The old, unencumbered asset would be replaced by investment capital encumbered by some expectation of payment.

A review of Talman's position before and after the government's breach is informative. Prior to the breach, plaintiff possessed $431.1 million in regulatory capital and had no obligation to make dividend payments.[62] This capital effectively became worthless after the breach. The capital raised by the stock floatation would have filled that hole. After the breach and the hypothetical issuance of preferred stock, plaintiff would again have had $431.1 million in capital *but also* an expectation of making dividend payments with a present value of $431.1 million *and* it would be out of pocket by $16.7 million. Admittedly, unlike supervisory goodwill, this capital could have been used not only to leverage borrowing and lending, but it could also have been directly invested to earn a return.

In sum, we reject defendant's argument that plaintiff's damages are capped at transaction costs. In so doing, we depart from the two prior *Winstar* damages decisions. In *Glendale,* plaintiff first argued the cost of replacement capital theory in its rebuttal case, as an alternative measure of damages. The court commented that plaintiff's claim—which sought $1.207 billion in damages for the cost of replacing $451 million in supervisory goodwill in 1993—did not "represent a plausible cost of capital." *Glendale,* 43 Fed.

Cl. at 402. In fact, the court found "something inherently odd" about plaintiff's claim that its costs exceeded the amount of capital raised. *Id.* at 401. The court noted that "elementary principles of finance suggest that plaintiff received $451 million and paid $451 million for that money," *id.* at 401–02, apparently acknowledging that the net present value of the recapitalization was zero. Yet, the court also recognized that Glendale had to pay a "premium" for this capital, presumably through its expectation of paying high-yield dividends. *Id.* at 402. If it costs $451 million to raise $451 million in capital irrespective of the dividend rate to be paid on the preferred stock, Glendale would not have paid a "premium." [63]

The court in *California Federal II* adopted Professor Miller's theory, awarding the thrift only its transaction costs. It accepted Professor Miller's testimony that "in finance, you take the cost of issuing stock the day it is issued. On the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or floatation costs." 43 Fed.Cl. at 461. The second of these two sentences is no doubt true—the only costs paid out on the day of issuance are floatation costs. The first sentence may or may not be true, but, with due respect, the court disagrees that it has relevance to a calculation of damages. The court is not limited to considering only the costs incurred by a plaintiff on a single day shortly after the breach. A plaintiff that has issued preferred stock to raise capital incurs an exposure to making dividend payments until the stock is retired. These payments would not have been incurred but for the need to replace supervisory goodwill following the breach. Consequently, dividend payments, as well as floatation costs, may be attributable to the government. Moreover, the cost of the dividend payments is not equal to their present value in 1989 because damages are not necessarily discounted back to the date of breach, *see infra* § IV.B.1, and

**62.** Plaintiff received this supervisory goodwill in consideration for its agreement to acquire the four failing thrifts in 1982. By performing its half of the bargain, plaintiff acquired the supervisory goodwill with no other payment obligations to the government for use of the asset.

**63.** We note that *Glendale* did not definitely resolve this issue because it was not raised until the plaintiff's rebuttal case. *See Glendale,* 43 Fed.Cl. at 402.

because damages are not discounted based upon risk.[64]

Despite having expressed its reservations about defendant's primary defense on the issue of quantum, the court has to add a caveat to the discussion. That is, the court's analysis is predicated on an assumption which was not tested at trial—namely, that the dividends in Professor James' model could be treated as a legal obligation and hence an expense item. The discussion above, like the model, presumes an obligation to pay dividends and that the monies generated by the underlying securities could be treated as regulatory capital. Defendant did not challenge that assumption at trial.[65] Given these circumstances, the court believes its analysis to be correct, and hence Professor Miller's analysis to be wrong.

### B. Adjustments to Professor James' Model

Defendant next contends that Professor James erred in his calculation of damages by (1) failing to properly discount the stream of dividend payments, and (2) adjusting the annual dividend payments upwards to recognize pre-tax costs. Regarding the former, Professor James did not discount any hypothetical dividend payments paid through December 1998; future (post–1998) payments are discounted to present (i.e. today's ) value using a 5% rate—the approximate average

rate on treasury securities as of September 1998, the date of his expert report.

#### 1. Discounting of Dividend Payments

Defendant's criticism of Professor James' discounting method is tied closely to its argument that all dividend payments should be discounted at the market rate of 20%. According to defendant, all dividend payments should be discounted to 1989, the date of issuance of the hypothetical preferred stock; otherwise, plaintiff's recovery would include a de facto award of pre-judgment interest. Moreover, it argues that the appropriate discount rate is 20%.

Defendant's argument again relies erroneously on present value analysis. It assumes that because the present value of the stream of dividend payments immediately prior to the hypothetical floatation is calculated by discounting these payments to 1989 using the rate of return on investments of similar risk (i.e., 20% in this case), any damages award should be discounted in the same manner. But we are not undertaking a net present value analysis here. Further, defendant has not cited any precedent for its approach. Instead, it relies solely on the testimony of Professor Miller, which we do not find to be persuasive in this regard.

■■■■ The law in this circuit is that expectancy damages on an ongoing contract are not discounted to the date of the breach.[66]

---

64. Put another way, a damages calculus and a present value analysis serve different ends and seek to measure different events. Present value analysis seeks to measure whether a particular financing decision makes sense considering other financing opportunities of similar risk. It discounts the future dividend stream to adjust for the *risk* of nonpayment and the *time* value of money. If the resulting figure is less than or equal to the amount of cash raised by the issuance, the security issuance is viable.

A damages calculus seeks to measure the costs incurred to raise capital to replace supervisory goodwill. There is no reason to discount damages already incurred (i.e, prior to the date of judgment) for risk of nonpayment or for time, because those damages have already been sustained. Future damages would be discounted for only the time value of money. *See infra* note 68.

65. Moreover, OTS' regulations provide support for Professor James' assumptions: the regulations implementing FIRREA expressly recognized that "noncumulative perpetual preferred

stock" is counted as core and tangible capital, *see* 54 Fed.Reg. at 46,859–60 (Nov. 8, 1989) (codified at 12 C.F.R. §§ 567.5(a)(ii), 567.9(b)(2) (1990)), and that this variety of preferred stock imposes a "fixed requirement to pay dividends." *Id.* at 46,860.

66. The general rule in this circuit is that "[t]he time when performance should have taken place is the time as of which damages are measured." *Reynolds v. United States*, 141 Ct.Cl. 211, 220, 158 F.Supp. 719, 725 (1958). In many cases, the appropriate date for calculation of damages is the date of breach. *See Estate of Berg v. United States*, 231 Ct.Cl. 466, 469, 687 F.2d 377, 380 (1982); *Cavanagh v. United States*, 12 Cl.Ct. 715, 718 (1987); *Northern Paiute Nation v. United States*, 9 Cl.Ct. 639, 643 (1986); see also *Northern Helex II*, 524 F.2d at 721 (holding that an offset to lost profits based upon the excess value of physical plant is determined by measuring the fair market value of the plant at the time of breach). But that rule does not apply to antici-

Instead, post-breach damages prior to the date of judgment are not discounted, and future damages (as of the date of judgment) are discounted by the rate of return on "conservative investment instruments." *See Northern Helex III*, 634 F.2d at 564; *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 722 (1975) ("*Northern Helex II* ").[67] Accordingly, Professor James' method, after a minor adjustment to make the date of judgment the date of discounting, is correct.[68] If plaintiff had actually raised capital according to Professor James' model, there is no reason why we should not fully compensate plaintiff for its dividend payments to date.[69]

Future payments, however, should be discounted to adjust for the time value of money to prevent plaintiff from receiving a windfall. In *Northern Helex*, the court used a discount rate of 9%, the rate on "conservative investment instruments" in October 1980. *See id.* Although the court was not more specific, we interpret this adjustment as discounting at the risk-free rate. Professor James testified that the average rate of return on Treasury securities with various durations was approximately 5% as of the date of his report. He thus applied this rate to post–1998 dividend payments. We find that discount rate was appropriate at the time of his report.[70]

## 2. Adjustment for Income Taxes

Professor James inflated each annual dividend payment to calculate the pre-tax cost to Talman of dividend payments on the hypothetical preferred stock. Plaintiff's assertion is that, because dividends on preferred stock are paid out after tax, the impact of these payments on Talman's pre-tax earnings would have been substantially larger than the amount of the actual dividend payments. Using a corporate tax rate of 40%,[71] the effect of this adjustment is equivalent to increasing the dividend rate to 33⅓%.

Defendant counters that pre-tax and after-tax costs of preferred stock are the same because dividends are not tax deductible. Moreover, under discount cash flow analysis, it argues that the actual stream of dividends should be discounted, not the earnings necessary to generate the dividends.

If Professor James had conducted a discounted cash flow analysis, this latter criti-

---

pated profits or other expectancy damages that would have accrued on an ongoing basis over the course of a contract, absent the breach. In these circumstances, damages are measured throughout the course of the contract. To prevent unjust enrichment of the plaintiff, the damages that would have arisen after the date of judgment must be discounted to the date of judgment. *See Northern Helex III*, 634 F.2d at 564 (discounting the portion of anticipated profits that would have arisen after the date of judgment).

**67.** The chain of events in *Northern Helex* matches the present case remarkably closely. In 1961, the government entered into a twenty-two year contract with the plaintiff. *See Northern Helex III*, 634 F.2d at 559, 564. Nine years into the contract, the government breached. *See id.* at 564. Northern Helex sued to recover lost profits. The Court of Claims awarded lost profits damages to the company in October 1980, almost ten years after the breach. *See id.* After calculating plaintiff's lost profits subsequent to the breach, the court discounted the portion of the lost profits that the company would have earned from October 1980 through August 1983, the termination date of the contract absent the breach. *See id.* No discount was applied to lost profits for the period from the breach through the date of judgment. *See id.*

**68.** Professor James discounted all payments to 1998, the date of his expert report.

**69.** Even if damages were to be calculated as of 1989 (the date of the breach), as defendant contends is appropriate, the stream of dividend payments would be discounted to 1989 dollars by adjusting solely for the time value of money. No adjustment for risk would be appropriate because (1) past dividends would have already been paid; and (2) future payments would be paid from the monies awarded in this judgment. No risk of nonpayment would remain. Discounting for time would be accomplished by using a risk-free rate. *See Northern Helex III*, 634 F.2d at 564 (using the rate on "conservative investment instruments"); *accord* Brealey & Myers, *supra* p. 64, at 226. This adjustment could be made by discounting future payments by the current rate of interest on Treasury securities.

**70.** Because the court holds *infra* that the cost of replacement capital should be measured based upon the actual method of capital replacement followed by plaintiff rather than Professor James' hypothetical model, there is no need to determine the discount rate at the time of judgment.

**71.** The basic corporate income tax rate in effect in 1989.

cism would have had some relevance. But he did not; he was not attempting to discount the dividend payments to the date of the breach. The former point is true, if one considers the cost of preferred stock to be the dividend rate paid on the stock. *See* Van Horne & Wachowicz, *supra* note 48, at 389–90. Yet, it does not address the plaintiff's concern that if plaintiff is awarded damages on the basis of dividend payments at 20%, after the damages are taxed, the remainder would be insufficient to make the dividend payments.

Although Professor James' method appears to serve an equitable purpose, we cannot accept plaintiff's adjustment for taxes. In essence, plaintiff is asking the court to adjust each dividend payment for income taxes that would be paid by the company on damages of an equal amount. This has the same effect as adjusting the entire damages award to compensate for future taxation of the damages award as income to plaintiff. Under plaintiff's approach, if we inflate the award now, plaintiff will be made whole once it pays income taxes on the judgment. Plaintiff has cited no precedent for allowing such an upward adjustment. Moreover, plaintiff's adjustment requires several assumptions: any damages award would be taxable as income, at a 40% rate; plaintiff's marginal tax rate was 40% from 1993 [72] until the present; and its marginal tax rate will remain at the 40% rate through 2012. We are not willing to make these assumptions and therefore we decline to allow the upward adjustment.

The impact of removing this income tax adjustment is substantial—without the adjustment, plaintiff's claim under the cost of replacement capital theory is reduced by more than $500 million, to $681.2 million.[73]

### C. Cost of Replacement Capital as a Limitation on Damages

Defendant objects to the use of cost of replacement capital as a measure of damages because use of this theory "as an alternative measure of damages is precluded when the cost of replacement is clearly disproportionate to the probable loss in value caused by the breach." It cites *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1372 (Fed.Cir.1998), for support. According to the government, cost of replacement capital cannot be used as a measure of damages if it exceeds plaintiff's "loss of value." Moreover, it argues that plaintiff suffered no loss in value (as shown by Ross' event study) and thus cannot recover the cost of replacement capital.

*Commercial Contractors* involved a construction contract and adopted an alternative damages provision of the *Restatement (Second) of Contracts*:

> If a breach results in *defective or unfinished construction* and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on (a) the diminution in the market price of the property caused by the breach, or (b) the reasonable *cost of completing performance or of remedying the defects* if that cost is not clearly disproportionate to the probable loss in value to him.

*Restatement (Second) of Contracts* § 348(2) (emphasis added); *see Commercial Contractors*, 154 F.3d at 1372. This provision is expressly limited to breaches of construction contracts, *see Restatement (Second) of Contracts* § 348 & cmt. c, and has been applied in this circuit only in construction cases. *See Commercial Contractors*, 154 F.3d 1357; *Granite Constr. Co. v. United States*, 962 F.2d 998 (Fed.Cir.1992); *C.J. Betters Corp. v. United States*, 25 Cl.Ct. 674 (1992).

Moreover, defendant's argument that Professor James' calculation of damages is clearly disproportionate to the value of the supervisory goodwill has no anchor. We have already rejected Ross' event study analysis. Setting that study aside, defendant has proposed no method by which to measure the value of supervisory goodwill, against which Professor James' calculation of damages can

---

**72.** Professor James did not inflate dividend payments for 1990 through 1992 because Talman would have had no tax obligation in those years due to the availability of NOLs to offset any taxable income.

**73.** This calculation is set out in Court Exhibit 3, which the court directed the parties to prepare after closing arguments using evidence in the record.

be compared. Without some alternative measure of the value of Talman's supervisory goodwill to which it can be compared, defendant's argument lacks a necessary point of reference.

 Nevertheless, for reasons explained above, the court agrees with defendant's larger point. The purpose of the rule in *Commercial Contractors* is a specific application of the general rule that a plaintiff is not entitled to recover mitigation expenses that are excessive. *See* 1 Dobbs, *Law of Remedies*, § 3.9 at 383 ("If the plaintiff actually expends funds in a reasonable effort to minimize damages, the expenditures are reasonable ... as a form of consequential damages. The key requirement is reasonableness."); *cf. Northern Helex II*, 207 Ct.Cl. at 875, 524 F.2d at 713 (stating that a plaintiff is entitled to damages that satisfy its expectancy interest "at the least cost to the defendant") (quoting *Restatement of Contracts* § 329 cmt. a). It precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation. In this case, mitigation was achieved through the ABN AMRO acquisition and was reasonable—it enabled plaintiff to avoid suffering lost profits and at less cost than floating preferred stock. There is therefore no reason to fabricate a purely hypothetical and more costly alternative. The question is whether plaintiff has proven any costs associated with its actual means of generating replacement capital.

During closing arguments, defendant's counsel raised an apparently related argument, that cost of replacement capital serves as a limitation on plaintiff's expectancy damages. According to defendant, if costs of replacement capital are lower than plaintiff's lost profits, the former serve as a ceiling on its damages; if the reverse is true, plaintiff simply recovers its lost profits. In other words, plaintiff can recover only the lesser of its proven costs of replacement capital or its proven lost profits. Although counsel cited no authority for this theory at closing argument, defendant's post-trial brief cites *Northern Helex II*, 207 Ct.Cl. at 875, 524 F.2d at 713, for the proposition that "under the law of this Circuit, [plaintiff] would be limited to

the award that compensates it 'at the least cost to the defendant.'" Def.'s Br. at 4 n. 3. According to defendant, because plaintiff cannot establish any lost profits here, it cannot recover any costs of replacement capital.

The "least cost" doctrine stated in *Northern Helex II*, which the court quoted from comment a of *Restatement of Contracts* section 329, is indeed sound, but is misapplied by defendant here. As plaintiff correctly notes, the reference to "least cost to the defendant" in the *Restatement* comment relates to the principle of mitigation, not the selection between multiple damages remedies—a plaintiff's damages must be reduced by any cost savings it realizes due to the breach. This is made clear in the next paragraph of *Northern Helex II*: "If the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return or by excusing him from the performance of a condition precedent, the amount of this saving is deducted from the damages that would otherwise be recoverable." 207 Ct.Cl. at 875, 524 F.2d at 713 (quoting *Restatement of Contracts* § 335). Here, plaintiff was not saved from performing any contractual duty by the government's breach—it had already assumed the $912.6 million in net liabilities—and thus did not realize any saved expenses due to the breach. Accordingly, this doctrine does not require any reduction in plaintiff's cost of replacement capital damages.

D. Cost of ABN AMRO's $300 Million Cash Infusion

 Plaintiff did not argue at trial that an alternative measure of damages is the cost associated with its acquisition by ABN AMRO. Defendant, however, has made the argument that plaintiff's damages should be limited to the out-of-pocket expenses Talman incurred to obtain the $300 million cash infusion from ABN AMRO. It alleges that these costs are of the order of $4 million, and should be offset by the benefits Talman and its shareholders received from the ABN AMRO acquisition, which far exceed that amount. In other words, plaintiff incurred no net costs in raising this capital.

In response, at closing argument, plaintiff contended that the cash from ABN AMRO, unlike supervisory goodwill, came with strings attached. Roberts testified, in the context of the lost profits claim, that ABN AMRO, which diverted this cash from other income-generating investments, employed a hurdle rate of twelve percent and thus expected LaSalle Talman to provide an annual contribution to ABN AMRO's earnings sufficient to meet this criterion. According to Court Exhibit 4, submitted by plaintiff,[74] the sum of these payments to ABN AMRO through 2012, adjusted to reflect the benefit of real capital,[75] would be $251 million.[76] Plaintiff asserts, therefore, that it would be entitled to recover this amount under an alternative cost of replacement capital theory.

The parties agree that ABN AMRO infused $300 million of cash into Talman in 1992 as a condition of the merger. There is little support, however, regarding a countervailing obligation in plaintiff to make payments to its parent. The May 1992 OTS report on Talman states that at the time of the acquisition by ABN AMRO in February 1992, it expected to pay all its 1992 and 1993 net income to ABN AMRO, and 50% of any excess capital in 1993. There is also no question that Talman paid substantial dividends—more than $417 million—to ABN AMRO between 1992 and the present.

The dividend payments however, although substantial, do not reflect a pattern of a 12 percent return. Instead, amounts are extremely low some years and disproportionately high in other years. Moreover, no documents were offered acknowledging any legal obligation to pay a return on the cash infusion. Although plaintiff offered a letter

prepared by an official at ABN AMRO in 1998 stating that the company expected a 12% rate of return on its investments in 1992, see Pl.'s Ex. 381, this document was not admitted for the truth of its contents, as the court found it insufficiently supported in foundation or reliability. See Tr. at 1073. It does not, in any event, reflect more than an expectation of a return, not a fixed obligation by plaintiff to pay dividends. No one from the parent bank testified. It is clear that LaSalle Talman elected to pay dividends when it wanted to or felt it could, not in response to any perceived "hurdle rate." More importantly, there is insufficient evidence for the court to conclude that these dividend payments would not have been made absent the $300 million cash infusion from ABN AMRO. The parent infused a great deal more than $300 million into LaSalle Talman. In other words, plaintiff has failed to show causation with respect to this element of damages.

In sum, plaintiff is thus not entitled to its cost of replacement capital, even if based upon the asserted "cost" of funds provided by ABN AMRO.[77] Further, even if plaintiff had established an obligation to pay dividends equivalent to the hurdle rate and Professor James' model were used to calculate plaintiff's cost, it would have to be adjusted as explained above.

## V. Restitution

Under plaintiff's final theory of recovery, it seeks, in the alternative, $295,143,000 in restitution. It derives this figure from its net cost of performing under the contract, i.e. the costs it incurred under the 1982 contract, offset by the benefits it received from the

---

74. This exhibit was prepared after trial at the direction of the court. The exhibit is based upon evidence in the record.

75. The exhibit takes into consideration the advantage of holding real capital by assuming that the $300 million would provide a benefit of 7% per annum, by reducing plaintiff's cost of funds.

76. Professor James testified that the cost of replacement capital under this theory would be $450–500 million, but provided no supporting calculations. See Tr. at 2238. We utilize instead the court exhibit. Plaintiff contends that the

actual cost model should not reflect a declining balance, as it is not posited on a hypothetical preferred stock model, although that would more closely mimic supervisory goodwill.

77. We agree with defendant that it is more appropriate to measure the cost of replacement capital based on the means by which plaintiff actually raised capital, rather than a hypothetical issuance of preferred stock, but that plaintiff has not established with sufficient proof that it incurred more than incidental costs in obtaining the ABN AMRO bailout.

government prior to the breach. The restitution calculation prepared by Professor James represents that plaintiff incurred costs of $912.6 million when it assumed the liabilities of the four failing thrifts under the 1982 contracts. His calculation accounts for two categories of benefits received by plaintiff: the payments received from FSLIC in the 1982–1986 period (totaling almost $586 million); and the net income of Talman, plus income taxes and amortization of goodwill, from the date of the contract until September 30, 1989 (totaling almost $32 million).

Two threshold matters complicate this method of calculating damages. First, the parties cannot agree on whether it is the 1982 contracts or the 1986 Financing Agreement which control. The latter is admittedly confusing in terms of its effect on the 1982 contracts. Solely for purposes of evaluating plaintiff's restitution argument, defendant argues that the 1986 contract is the only one now in existence.[78] Consequently, because plaintiff did not assume any liabilities under the 1986 contract, it did not incur any costs and cannot obtain restitution. Plaintiff disagrees. It contends that the 1986 Financing Agreement either supplemented or incorporated the 1982 contracts, but that in either event the 1982 obligations are the relevant point of departure in a restitution analysis.

There is evidence to support both constructions. The contract provision cited by the government, Section 8.08 of the 1986 Financing Agreement, states: "This Agreement (together with the Exhibits) embodies all agreements between FSLIC and Talman Home relating to the subject matter of this Agreement and supersedes all prior agreements and understandings between FSLIC and Talman Home relating to such subject matter." Pl.'s Ex. 83 at 64. The exhibits referred to include the 1986 goodwill agreement. Defendant argues that this section voids the 1982 agreements. The court disagrees.

Section 8.08 is merely an integration clause, operating to nullify any drafts or prior agreements regarding the precise subject matter of the 1986 Financing Agreement, which was the provision of financial support necessary to allow Talman to convert to a stock association. The 1982 agreements did not pertain to that subject matter, and were not voided by section 8.08. That section 8.08 is an integration clause can be seen by reference to the 1982 Master Agreement. Section 7.6 of that contract includes a similarly-worded integration clause: "This Master Agreement, the Certificates contemplated hereby, and the Purchase Agreement ... embody the entire agreement between the parties and supersede all prior agreements and understandings relating to the subject matter hereof." Pl.'s Ex. 13 at 66. There is no evidence in the record that this provision was included to supersede a prior contract between FSLIC and Talman, if one existed; instead, it is merely a standard integration clause used by FSLIC. *Cf. Winstar,* 518 U.S. at 862, 116 S.Ct. 2432 (identifying a similarly-worded provision in Winstar's contract as an integration clause).

Two other provisions of the 1986 Financing Agreement, not cited by defendant, support its argument that the contract voided at least some part of the 1982 agreements, however:

> The Plan [to increase Talman's net worth and allow it to go public] contemplates the following will occur at the Closing ... (iv) the [1982] Purchase Agreement and the [1982] Master Agreement (collectively the "Prior Agreements") will be terminated.

Pl.'s Ex. 83, Recital I, at 3. In addition, section 3.02 provided that at the Closing:

> (a) FSLIC will (i) deliver the Income Capital Certificates to Talman Home for cancellation and (ii) pay to Talman Home [a cash payment of $165 million]; and
>
> (b) Talman Home will deliver to FSLIC (i) the FSLIC Warrants to be issued by Talman Home on the Closing Date duly executed on behalf of Talman Home and (ii) a fully executed counterpart of the Warrant Agreement.

Subject to the consummation of the transactions contemplated by the preceding sen-

---

78. This argument is contrary to its argument in connection with plaintiff's lost profits claim that

the date of the 1982 contracts is the relevant measuring point for foreseeability of lost profits.

tence, the Prior Agreements are hereby terminated as of the Closing Date.

Pl.'s Ex. 83 at 15–16.

The closing date was set as the date on which Talman converted from a mutual to a stock form—December 23, 1986. As of that date, these provisions terminated the 1982 purchase and master agreements. One 1982 contract between FSLIC and Talman was not terminated by the 1986 Financing Agreement, however—the acquisition agreement regarding Unity. There were other agreements struck in 1982, moreover, which were unaffected by the 1986 agreements, namely, the acquisitions of Northwest, Alliance, and Peoria. In addition, the use of purchase accounting with respect to supervisory goodwill was permitted by FHLBB Resolution 82–110 and FHLBB Memorandum R–31b. *See California Federal I*, 39 Fed.Cl. at 765. Those documents were unaffected by the 1986 Financing Agreement.

Thus, although some of the 1982 contracts were terminated, the overall effect of those interlocking agreements and FHLBB resolutions continued. Indeed, their continued effect is essential to an understanding of the 1986 contract. For example, the 1986 goodwill agreement provides for a $100 million dollar reduction in supervisory goodwill, which was created by the 1982 mergers. It had to be presumed, however, that Talman clearly retained the balance of its outstanding supervisory goodwill—which derived from the 1982 agreements.

The continued vitality of the 1982 agreements is implicit in Chief Judge Smith's ruling in the liability phase of this case. Defendant raised this identical issue and did not prevail. Although Chief Judge Smith's opinion did not provide any extensive discussion, it is clear that he considered the 1986 contract with FSLIC as merely modifying the 1982 contracts. *See id.* at 765–66 ("In 1986, Talman executed an agreement with the government confirming the treatment of goodwill that had been agreed upon in 1982."). Accordingly, when the court evaluates the

parties' calculations of restitution damages, it will treat the 1982 and 1986 agreements as part of a whole, using as a point of departure the undertakings of the 1982 agreement as modified in 1986.

The second threshold issue is more troubling. Both parties have presented their restitution analysis on the assumption that the remedy is, according to *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), *vacated by unpublished order*, No. 349–57 (Ct.Cl. Jan. 27, 1967), "an alternative remedy for breach of contract in an effort to restore the innocent party to its pre-contract status quo, and not to prevent the unjust enrichment of the breaching party." On this assumption, Professor James set up his model to compare the costs incurred by plaintiff with the benefits it received from the government. The model does not attempt to recoup the benefits conferred by plaintiff on the government.[79] The government endorses that approach in principle.

Yet, the fundamental purpose of restitution is "to prevent unjust enrichment." *Restatement (Second) of Contracts* § 344, cmt. a; *see id.* § 373, cmt. a; *Restatement of Restitution* § 1 (1937); *Nashville Lodging Co. v. RTC*, 59 F.3d 236, 240 (D.C.Cir.1995); *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir.1992); Dobbs, *Law of Remedies*, § 12.7(1) at 159; *cf. Great Am. Ins. Co. v. United States*, 203 Ct.Cl. 592, 602, 492 F.2d 821, 827 (1974) (citing *Restatement of Restitution* § 1). Restitution serves to protect the plaintiff's "interest in having restored to him any benefit that he has conferred on the other party." *Restatement (Second) of Contracts* § 344(c); *see also Far West Federal Bank v. OTS*, 119 F.3d 1358, 1366 (9th Cir.1997); *Restatement (Second) of Contracts* §§ 370 & cmt. a, 371 cmt. a. Accordingly, in the specific context of a breach of contract, the non-

---

79. Indeed, plaintiff initially presented a claim for $2.52 billion in restitution based upon the expert report of Dr. James Barth, which was premised on recovery of the benefit conferred by Talman on the government. Plaintiff abandoned that approach shortly prior to trial, however, and adopted the restitution claim discussed in the text above, prepared by Professor James.

breaching party "is entitled to restitution for any benefits that he has conferred on the other party by way of part performance or reliance." *Id.* § 373(1); *see ATACS Corp. v. Trans World Communications, Inc.,* 155 F.3d 659, 669 (3d Cir. 1998); *Bausch & Lomb,* 977 F.2d at 729–30. Indeed, a plaintiff is entitled to restitution "only to the extent that he has conferred a benefit on the other party by way of part performance." *Restatement (Second) of Contracts* § 370; *see Novecon Ltd. v. Bulgarian–American Enter. Fund,* 190 F.3d 556, 565–66 (D.C.Cir.1999).

 The *Restatement* offers two measures of the benefit conferred on the breaching party:

(a) the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position, or

(b) the extent to which the other party's property has been increased in value or his other interests advanced.

*Restatement (Second) of Contracts* § 371; *see also* Dobbs, *Law of Remedies* § 12.7(1) at 161. Courts have frequently adopted the former "value of goods or services received" approach, which is generally based on the market valuation of the performance. *See Behan,* 110 U.S. at 345, 4 S.Ct. 81; *ATACS,* 155 F.3d at 671; *RTC v. FSLIC,* 25 F.3d 1493, 1505 (10th Cir.1994); *Bausch & Lomb,* 977 F.2d at 729; *Restatement (Second) of Contracts* § 371 cmt. a. The breaching party is entitled to an offset measured by the value of the benefit it has conferred on the other party. *See Bausch & Lomb,* 977 F.2d at 729; *Restatement (Second) of Contracts* § 374(1); *Restatement of Restitution* § 159; *accord Arizona v. United States,* 216 Ct.Cl. 221, 238, 575 F.2d 855, 865 (1978) (following *Restatement of Contracts* § 347).

This is set out plainly in Farnsworth's treatise:

In contrast to cases in which the court grants specific performance or awards damages as a remedy for breach, the effort

is not to enforce the promise by protecting the injured party's expectation or reliance interest, but *to prevent unjust enrichment of the party in breach* by protecting the injured party's restitution interest. The objective is not to put the *injured* party in as good a position as that party would have been in if the contract had been performed, nor even to put the *injured* party back in the position that party would have been in if the contract had not been made. It is, rather, to put the party *in breach* back in the position that party would have been in if the contract had not been made.

E. Allan Farnsworth, 3 *Farnsworth on Contracts* § 12.19 (2d ed.1998) (first emphasis added); *see also* Dobbs, *Law of Remedies* § 12.7(1) at 160 (stating that the "restitution award focuses on the breacher and seeks to prevent his unjust enrichment by forcing restitution of gains he received under the contract").

The approach adopted by Professor James disregards these fundamental tenets of restitution, by shifting the focus from the *benefit* received by the government to plaintiff's alleged *costs* in performing the contract. These costs—which Professor James assesses to be $912.6 million—form the driving force for his analysis and underpin his conclusion that plaintiff is entitled to a recovery. The parties have thus not presented the court with the components of a restitution analysis pursuant to the *Restatement* model.

The apparent reason for the parties' approach is a mistaken reliance upon *Acme.* Two aspects of that decision are pertinent here. First, the sentence quoted above from *Acme*—which rejects prevention of unjust enrichment as the goal of restitution—appears to take a diametrically opposite approach to that of the *Restatement, Farnsworth,* and the cited cases. Upon closer analysis, however, it becomes clear that the language used by the Court of Claims should be limited to the context of that case.[80] Sec-

---

**80.** It is also dicta, at best. The decision was vacated by the Court of Claims after the case was reversed and remanded by the Supreme Court. *See Acme Process Equip. Co. v. United States,* 179 Ct.Cl. 928, 1967 WL 1539 (1967). Moreover, the

quoted sentenced was directly contrary to the core tenet of the *Restatement of Restitution*—the prevention of unjust enrichment, *see Restatement of Restitution* § 1—and somewhat at odds with

ond, the court's reliance upon plaintiff's costs of performance as the measure of restitution does not reflect the presumptive approach to restitution; it is merely an alternative measure of the value of plaintiff's services which the court utilized in the unique circumstances of that case.

 As the court makes clear in *Acme*, restitution is, in effect, a recovery for *quantum meruit*, giving the injured party "the reasonable value of his services." *Acme*, 171 Ct.Cl. at 356, 347 F.2d at 528. On its face, this statement is consistent with the first measure of restitution set out in the second *Restatement of Contracts. See Restatement (Second) of Contracts* § 371(a); *see also, e.g., Behan*, 110 U.S. at 345, 4 S.Ct. 81. The Court of Claims, however, held that the plaintiff was entitled to recover the value of services it had *performed*, even though the government had *received* the benefit of only some of these services. *See Acme*, 171 Ct.Cl. at 359, 347 F.2d at 530.[81] If the decision had not been reversed by the Supreme Court, it would have required the government to pay restitution for services that it never received.[82] This holding was inconsistent with the general rule that the measure of restitution is the value of goods or services received by the breaching party. *See Restatement of Contracts* § 348 ("Restitution is available as a remedy, with respect to a performance by the plaintiff, only if it is a performance which the defendant has bargained for and received . . . ."); *id.* cmt. a ("Restitution means that the defendant must give something back to

the plaintiff. This he cannot do unless he has received something."); *id.* § 333 cmt. e (stating that restitution "requires the return of value received by the defendant").[83] This language in *Acme*, to the extent it survives the order of vacation, should thus be construed as recognizing an exception to the general rule, not abrogating it. *See Schwartz v. Gregori*, 45 F.3d 1017, 1022 (6th Cir.1995) (stating that restitution to prevent unjust enrichment "is not required in every case"); *Restatement of Restitution* § 1 cmt. e ("The amount of recovery, however, is not invariably determined by the value of what is received. In some cases the value of what is given is determinative . . . .").

 Regarding the second point, the Court of Claims did not hold that a plaintiff's costs are the presumptive measure of restitution. To the contrary, the court confirmed that "the reasonable value of its services" is the appropriate measure. *Acme*, 171 Ct.Cl. at 359, 347 F.2d at 530. It concluded, however, that this value could not be measured directly in that particular case, but should be measured instead by the proxy of plaintiff's costs of performance. *See id.* Again, this decision does not establish a new general rule, but instead provides an exception to the traditional measure of restitution: When the value of the injured party's performance cannot be meaningfully measured by the benefit conferred on the breaching party or by the market value of the goods or services rendered (as was the situation in *Acme* ),[84] then

---

the general rule of the first *Restatement of Contracts. See Restatement of Contracts* § 348.

81. The contract, as modified, required Acme to furnish and deliver 2751 recoilless rifles over a thirty-month period. The government terminated the contract less than a year after the first scheduled delivery and consequently received only 1163 rifles. *See Acme*, 171 Ct.Cl. at 381–82, 347 F.2d 509.

82. The case was remanded to the trial commissioner to determine the quantum of restitution. This remand was mooted by the Supreme Court's reversal.

83. That general rule is retained in the second *Restatement of Contracts*, which was published more than a decade after the *Acme* decision. *See Restatement (Second) of Contracts* § 344 cmt. a (stating that restitution requires the defendant

"to disgorge the benefit he has received by returning it to the party who conferred it"); *id.* § 370 cmt. a ("[A] party's expenditures in preparation for performance that do not confer a benefit on the other party do not give rise to a restitution interest. . . . If, for example, the performance consists of the manufacture and delivery of goods and the buyer wrongfully prevents its completion, the seller is not entitled to restitution because no benefit has been conferred on the buyer.").

84. In *Acme*, the benefit conferred on the government (in terms of its increased wealth) would not have been a fair means of measuring restitution, because the government had canceled the contract before the contractor could deliver the contracted quantity of rifles, yet the contractor had incurred substantial costs of performance which exceeded the value of rifles delivered. Moreover,

an alternative means of measuring value conferred is the cost incurred by the injured party. In such circumstances, restitution would appear to be more accurately characterized as "reliance" damages because it allows the plaintiff to recover all costs expended and puts plaintiff "in as good a position as [it] would have been in had the contract not been made."[85] *Restatement (Second) of Contracts* § 344(b); *see also Restatement of Contracts* § 348 cmt. d ("The expenditures of the plaintiff in part performance of the contract or in preparation therefor can be proved in certain cases as a means of determining the amount of damages, even though neither the money nor its product has been received by the defendant. The remedy sought, however, is damages and is governed by the rules applicable thereto; it is not restitution.").[86]

■ The unusual circumstances present in *Acme* are not present in this case—defendant obviously benefitted from plaintiff's takeover of the obligations associated with the acquired thrifts' liabilities and, with the critical assistance of a substantial decline in interest rates, obviated the looming need to liquidate Unity (and perhaps Peoria). Plaintiff's restitution recovery, if any, thus should be based upon the benefit conferred upon the government by Talman's contractual agreement to assume the liabilities of the four ailing thrifts.[87] But plaintiff did not provide any quantification of that benefit because it focused instead on its costs. Because plaintiff bears the burden of quantifying the benefit of services rendered, it is, strictly speaking, entitled to no restitution. *See Restatement (Second) of Contracts* § 374 cmt. b (stating that "[s]ince the party seeking restitution is responsible for posing the problem of measurement of benefit, doubts will be resolved against him" and that "[i]f no value can be put on this [benefit], he cannot recover."). Nevertheless, the parties litigated this claim under the *Acme* approach, and we will address plaintiff's claim

---

plaintiff presented no evidence of the reasonable value of its services other than the costs it had incurred.

85. The first *Restatement*, published in 1932, uses language akin to that later used to define a plaintiff's "reliance" interest: "the purpose to be attained is the restoration of the injured party to as good a position as that occupied by him before the contract was made." *Restatement of Contracts* § 347 cmt. b; *accord Acme*, 171 Ct.Cl. at 359, 347 F.2d at 530 (stating that the purpose of restitution is "to restore the innocent party to its pre-contract *status quo*"). The second *Restatement*, published in 1981, departs from that approach by shifting the focus to the defendant, emphasizing that the purpose of restitution is to prevent unjust enrichment of the breaching party. *See, e.g., Restatement (Second) of Contracts* § 373 cmt. a; *accord* 3 *Farnsworth on Contracts* § 12.19 (quoted in the text *supra* ).

86. The second *Restatement* further notes that the "reasonable value [of the injured party's services] to the party against whom restitution is sought ... is ordinarily less than the cost to the party seeking restitution, since his expenditures are excluded to the extent they conferred no benefit." *Restatement (Second) of Contracts* § 371 cmt. b; *see id.* § 344 cmt. a.

87. We note that the benefit conferred on the government is not presumptively the amount of the net liabilities assumed. *But see Glendale*, 43 Fed.Cl. at 405–07 (calculating the benefit conferred as including Broward's net liabilities of $734 million). First, liquidation costs may only approximate net liabilities. Second, and more importantly, FSLIC had numerous options available short of liquidating a thrift. Because of its limited funds, the agency viewed liquidation as the least attractive option and thus resorted to that device only when absolutely necessary. *See Winstar*, 518 U.S. at 847 n. 3, 116 S.Ct. 2432 (noting that only 48 thrifts were liquidated prior to 1986). To recover avoided liquidation costs, plaintiff would need to show that, absent the supervisory merger, FSLIC more probably than not would have liquidated the thrift (or thrifts) acquired. *See Restatement (Second) of Contracts* § 374 cmt. b. *But see Glendale*, 43 Fed.Cl. at 406 (placing the burden on the government to establish that liquidation would not have occurred).

In this case, where plaintiff is a Phoenix institution, avoided liquidation costs may present a viable measure of benefit conferred, at least with respect to Unity. FHLBB acknowledged that the creation of the Phoenix was "one of the last possible solutions" available to FSLIC. Letter from Richard T. Pratt, FHLBB Chairman, to Sen. William Proxmire, Feb. 23, 1983 at 2 (Def.'s Ex. 44). Moreover, Chicago was one of the most depressed S & L markets in the country, and Unity was one of the most troubled thrifts in that market. FSLIC had made considerable efforts to find an acquirer for Unity, but to no avail. We reach no conclusion on this matter, however, because the parties have not litigated this precise issue.

as litigated.[88]

Defendant raises two comprehensive defenses to restitution. Its first argument—that Talman was in a better financial position at the time of the breach than before the mergers—is irrelevant. Not merely because it does not purport to measure the benefit conferred on the government, but also because even the alternative methodology set out in *Acme* does not literally put the injured party into its pre-contract status. Rather, even that alternative more carefully evaluates real costs incurred and benefits bestowed.

Defendant offers another general defense to a restitution-based recovery. It contends that, even if the 1982 agreements govern, plaintiff cannot obtain restitution because Talman was approaching negative book value prior to entering the contract and thus could not meaningfully assume any liabilities. It supports this argument with the expert report and testimony of Dr. Jack Guttentag. Dr. Guttentag contends that Talman could not have incurred any costs because it was "effectively dead" in early 1982, prior to the mergers, and "cadavers cannot assume liabilities."

The court disagrees. The whole purpose of the 1982 agreements was to maintain plaintiff as a viable institution. For that matter, the FSLIC would have been "technically insolvent" if it had been compelled to simultaneously honor all its obligations. *See Winstar*, 518 U.S. at 850, 116 S.Ct. 2432 (citing testimony of former FHLBB Chairman Richard T. Pratt before Congress). Talman *did* assume the liabilities of the acquired thrifts, and it met its obligations to repay depositors. The bank's obligation to honor deposits was no less real than that of the regulator. Arguably, it was more real, because FSLIC's obligation was contingent upon Talman's failure—an event that never materialized. If the bank was functionally incapable of accepting legal obligations then the agreements were illusory. They were not illusory, however, as subsequent events demonstrated.[89]

Although the court rejects these general defenses, they highlight a different problem plaintiff faces with the restitution model. The very inability of the bank to immediately liquidate the liabilities it assumed (and, for that matter, the inability of the FSLIC to absorb the simultaneous defaults of hundreds of similarly-situated banks) suggests, not, as the government argues, that this is an illusory assumption of liability, but that it is not a meaningful measure of plaintiff's costs.

Plaintiff's model freezes the assumption of liabilities at a particular moment in time when the deposits were least valuable, 1982. The largest component of Professor James' calculation is a cost item of $912.6 million, representing supervisory goodwill, or the amount by which the assumed liabilities exceeded the value of the taken-over thrifts. There was a substantial amount of uncertainty in the air at the time of the 1982 agreements, however. The value of the assets Talman assumed was highly changeable. In

88. The approach adopted by plaintiff is similar to the restitution analysis presented by the plaintiff in *California Federal II*. The court recognized that the measure of recovery under restitution is the value of goods or services rendered by the plaintiff. *See California Federal II*, 43 Fed.Cl. at 450 (citing John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 15–4, at 651 (3d ed.1987)). But it also cited the dicta in *Acme* with approval. *See id.* It implicitly resolved the tension between the *Restatement* approach and that taken by plaintiff by adopting the latter and assessing the cost of assuming liabilities of acquired thrifts. *See id.* at 451–53, 347 F.2d 509.

The analysis in *Glendale* also focused on the amount of net liabilities assumed, although couched as a benefit analysis. The court explicitly adopted the *Restatement* approach, holding that "Glendale is entitled to restitution damages for the benefit conferred on defendant." *Glendale*, 43 Fed.Cl. at 405; *see id.* at 404 (citing *Restatement (Second) of Contracts* § 344(c)). The court accepted the plaintiff's argument that the benefit conferred was represented by the amount of the net liabilities assumed. *See id.* at 405–07.

We disagree, respectfully, that the "cost" of assuming liabilities is presumptively the most appropriate basis for measuring restitution in the FIRREA context—either explicitly under the *Acme* approach, or implicitly as the measure of the government's benefit.

89. This argument attempts to re-litigate the issue of liability, which has been resolved against defendant. *See California Federal I*, 39 Fed.Cl. at 765–66, 769. By granting summary judgment for plaintiff, the court rejected defendant's argument that Talman's consideration was illusory.

fact, the parties were expecting interest rates to decline and thereby alter the value of the portfolio dramatically. There would have been little incentive for Talman to take over these four other institutions without the expectation that falling interest rates would make the deal work. If they had not, both parties would have been in serious trouble. In that respect, they were not disappointed. In the following years, interest rates fell and Talman was able to realize substantial gains from the sale of acquired assets.

Furthermore, the way plaintiff has set up its calculation builds on the part of the agreement which was *not* breached—the assumption of assets and liabilities of the four S & Ls. This was a multi-part agreement, only part of which was breached—the ability to claim supervisory goodwill toward regulatory capital. It is inappropriate to build a remedy founded on the very part of the agreement that went forward unaffected, and, in fact, was successful from the perspective of both parties. Because Talman assumed the liabilities of the four S & Ls and eventually became a profitable institution, FSLIC avoided the costs of liquidating any of the four thrifts; for its part, Talman acquired immediate entry into two profitable lines of business—mortgage banking and insurance—and, through the acquisition of branch offices, expanded its deposit base in the Chicago metropolitan area.

The $912.6 million of net liabilities assumed is the only cost item identified by Professor James. He concedes that Talman invested no money of its own at the times of the 1982 transactions. Although, over time, Talman eventually did repay some of those depositors, plaintiff has not asserted, as it cannot, that there was a net loss to the bank in making those repayments. As Chief Judge Smith pointed out in *Glendale*, "while the evidence obviously shows that Glendale assumed the entirety of Broward's liabilities and its assets, and was responsible for the difference (to be assisted by the government's goodwill), it did not show that it actually had to expend that amount in reliance on the contract." 43 Fed.Cl. at 403. Similarly, Talman has not shown that it incurred any actual costs by assuming the liabilities of the four acquired thrifts. If the court utilizes the plaintiff's formula for calculating restitution damages, therefore, it is inappropriate to treat the net assumed liabilities of $912.6 million as a "cost incurred."

Plaintiff amortized approximately $225 million of supervisory goodwill prior to the breach,[90] but this amount was more than offset by capital gains of almost $255 million realized in 1982–84 from the sale of acquired assets, and accretion income in excess of $150 million prior to the breach.[91] Plaintiff did not incur any net cost from its assumption of the liabilities of the four thrifts in 1982.[92]

This disposes of the "cost" side of the ledger. There is, however, another side that must be considered under plaintiff's model—benefits conferred on the injured party. The benefits it is willing to recognize are the $585.6 million in direct cash payments and cancellation of debt provided by FSLIC, and Talman's net income between 1982 and 1989 of $31.8 million. This latter figure may understate the real benefits of the 1982 agreements to plaintiff, however, as it fails to account for unrealized gains on the acquired

---

**90.** In this calculation, we do not include the $225.4 million of supervisory goodwill amortized in 1985 and 1986 using cash infused by FSLIC. This amortization did not constitute a cost incurred by Talman.

**91.** Amortization expense may be counted as a cost because it is an expense item customarily reported on a bank's income statement. This expense must be offset, however, by capital gains from sales of assets and accretion, which are reported on an income statement as additions to income.

**92.** Defendant cites *Far West* and *RTC* for the proposition that plaintiff's costs are limited to

"any amounts it *actually expended* in performing the relevant agreements." Def.'s Post–Trial Br. at 12. Those two cases, however, address the *benefits* conferred by investors, not their costs of performance. *See Far West*, 119 F.3d at 1366; *RTC*, 25 F.3d at 1504. Moreover, to the extent that investors' costs incurred and benefits conferred were equated by the courts in those cases, that assessment is limited to the context of restitution claims by *investors*, where the cash investment is the only possible measure of cost or benefit. In the case of a bank plaintiff, however, that is not the case. *See Glendale*, 43 Fed.Cl. at 407 n. 10.

assets that were not sold by Talman prior to the breach.[93] Nevertheless, plaintiff acknowledges that defendant provided it with benefits exceeding $600 million. This amount vastly exceeds its proven costs (i.e., zero).

It is not even necessary, therefore, to attempt to value the less quantifiable benefits the government contends should be added to the mix: the value of new retail branches;[94] the value of entering mortgage banking and mortgage insurance lines of business; NOLs; and economies of scale. Once the net assumed liabilities are removed from the calculus, plaintiff received net benefits from the government. Plaintiff is not entitled to restitution.

## CONCLUSION

The court has assessed the quantum of plaintiff's recovery under three separate methodologies. Plaintiff is not entitled to restitution. It has not proven that it has incurred or will incur any lost profits. It has not shown that it is entitled to any costs of replacement capital. Plaintiff is, however, entitled to recover its proven incidental damages. Accordingly, the Clerk is directed to enter judgment for plaintiff in the amount of $5,008,700.00.[95] Each side to bear its own costs.

---

**93.** Although most of the acquired assets were sold in 1982–84, some assets were retained and increased in value as interest rates continued to fall.

**94.** Plaintiff continues to operate some of the branches acquired from the 1982 mergers. It has not offered to give up these branches. That fact alone mitigates against any award of restitution. *See Adams v. Zimmerman,* 73 F.3d 1164, 1173 (1st Cir.1996); *Restatement (Second) of Contracts* § 384(1).

**95.** All pending dispositive motions and motions in limine are denied. *See supra* note 1. Defendant's August 27, 1999 motion for leave to file additional exhibits is granted.